S. S. DILENBECK, Appellant, v. J. E. DAVIS, Appellee.

**FRAUD:** Fraudulent Representations—Non-Waiver. A provision in a contract of sale of a business that the sellers were to be relieved of all responsibility in connection with said business, and were not to become or be held personally liable in any manner whatsoever, except as to a certain note, was not a waiver of the right to damages for fraudulent representations.

**FRAUD:** Fraudulent Representations—Evidence—Notes Held by Bank—Refusal to Guarantee. That the sellers of a banking business refused to guarantee the payment of notes held by the bank would not prevent the buyer from recovering against the sellers for false representations as to the responsibility of the makers of the notes.

**FRAUD:** Fraudulent Representations—Remedies—Rescission or Damages. Where a sale of business was induced by fraudulent representations, the purchaser could either rescind the contract, or perform it and recoup his damages for the fraud.

**FRAUD:** Fraudulent Representations—Evidence—Sufficiency. Evidence reviewed, and finding of trial court that false representations were not made innocently, through mistake, by sellers of a banking business, sustained.

**FRAUD:** Fraudulent Representations—Opinion or Fact—Expressions as to Value. Ordinary expressions as to value will not constitute fraud; but, where they are intended to be taken as a fact, and the parties do not have an equal opportunity to ascertain their truth or falsity, then such an opinion is actionable.

**FRAUD:** Fraudulent Representations—Opinion or Fact—Financial Responsibility of Third Person. Statements as to the solvency or financial responsibility of a third person are statements of fact, and not a mere expression of opinion. Accordingly, *held*

that representations of the sellers of a bank that notes held by the bank were good, and collectible, were representations of facts, as distinguished from mere opinions, although the sellers had refused to guarantee the payment of the notes.

SALINGER, J., dissents.

FRAUD: Acts Constituting Fraud—Representing Facts Within 7 Knowledge—Estoppel. Sellers of a bank, having represented that facts as to the condition of a bank were within their knowledge, cannot afterwards say that they had no knowledge upon the subject, and that a purchaser who relied upon them and was deceived by their falsity should not have been deceived.

FRAUD: Fraudulent Representations—Damages—Value of Bank 8 Stock. In an action for fraudulent misrepresentations as to the sale of bank stock, to arrive at the damages there should be taken into consideration the character and nature of the business and of the assets and their value, and the value of the business in the condition in which it actually was, and the value it would have if it had been as represented.

*Appeal from Perry Superior Court.*—W. W. CARDELL, Judge.

MAY 14, 1919.

ACTION by plaintiff to recover a balance alleged to be due on a promissory note, executed by the defendant, and to foreclose a pledge of 95 shares of stock owned by the defendant in the Citizens Trust & Savings Bank, of Perry, Iowa, which were given as security for the payment thereof. Defendant filed a cross-petition, asking damages for false representation in the sale of property by plaintiff to defendant. After a full trial to the court, the court found that plaintiff had made the false representations, as alleged by the defendant, and that defendant had been damaged thereby. Judgment was rendered in favor of the defendant for $11,262.92, and the note sued on was canceled. All other relief asked by defendant was denied. Defendant has not appealed. The facts are more fully stated in the opinion. Plaintiff appeals.—*Affirmed.*

*Dugan & Dugan,* for appellant.

*S. Trevarthen* and *D. C. Waggoner,* for appellee.

PRESTON, J.—The pleadings and the record are quite voluminous. We shall condense as much as possible. Appellee concedes that appellant's statement of the nature of this action is correct. It is substantially as follows:

"The defendant, or appellee, admitted the execution of the note and liability on the same, except for the matters alleged, and claimed an offset to said note and damages against appellant in the sum of $35,000, and $10,000 exemplary damages for fraud and misrepresentations in the sale of 450 shares of stock sold by the appellant to appellee, claiming that appellant was president of said bank, and represented that said bank stock was worth $115 per share, and that the bank books showed the true condition of the bank at all times, and that, for a series of years, dividends were paid to stockholders of said bank from the net profits. That said records and books exhibited by plaintiff to defendant showed all time deposits drew a uniform rate of 4 per cent, while, in fact, a large amount of time certificates had been issued to plaintiff that bore 5 and 6 per cent interest, who was president of the bank after defendant purchased said stock, without authority of the board of directors. That notes and securities of the amount of $50,000 owned by the bank were represented by plaintiff to be good, and that the bank would not lose a dollar on them. That there were many poor loans made by the bank, and overdrafts against certain parties, which were uncollectible. That the sale of said bank stock to appellee included the loan business of S. S. Dilenbeck, and that there were representations that the profits of said business amounted to $1,200 to $1,500 per month, and that appellant had made excessive loans; and further represented that the stock of the bank was worth $107 per share, but, on account of the hidden assets of the bank, the loan

business of S. S. Dilenbeck & Son and the good will of both
bank and loan business enhanced the value of said bank stock
to $150 per share. That on December 1, 1915, the appellant
coerced and by duress caused appellee to execute a note to
him in the sum of $2,808 for dividends he claimed was due
him for 1915 on said bank stock, when, in fact, appellee al-
leges no dividends were earned. That appellant and his son
were receiving the mail of S. S. Dilenbeck & Son, that should
go to him, and that they refused to turn the same over to
him. That appellee relied on said representations, which he
claims were false, and acted thereon to his damage in the
sum of $35,000, for which he asked judgment, plus the fur-
ther sum of $10,000 as exemplary damages, the cancellation
of the note for dividends and note sued upon, and an in-
junction against plaintiff from receiving the mail of S. S.
Dilenbeck & Son, or interfering in any way with the loan
business sold to defendant. The appellant, in answer to
appellee's cross-petition, denied the allegations, claiming and
alleging appellant and his son, B. C. Dilenbeck, sold, on Oc-
tober 6, 1915, to appellee 546 shares of stock in said bank,
under written contract, Exhibit A, attached to said answer;
and that appellee and his stock broker, defendant's agent
from Omaha, investigated all of the matters complained of
for himself, and that he was informed before said purchase
that certain depositors were receiving more than 4 per cent,
and that appellant received 6 per cent on his own deposits;
that said contract, Exhibit A, wherein the said Davis agreed
to pay said depositors according to the agreements made
with them; that appellee, with full knowledge of said mat-
ters, permitted the bank to pay appellant said 6 per cent,
and is now estopped from claiming any damages by said al-
leged illegality on the bank or its successor's part, which suc-
cessor, the appellee, is president. That appellee, or defend-
ant, has suffered no damage of the matters complained of
in Division 4 *et seq.;* that no guaranty was given as to any

of the securities in said bank, and that appellant should
have no liability whatsoever, as it was so agreed, orally, and
by the written contract of sale of said bank stock; and fur-
ther pleaded a waiver and estoppel upon the said J. E.
Davis, appellee. The appellant denied the duress and co-
ercion in the giving of the note for $2,808, and that said note
had been transferred to persons not parties to this suit, and
for that reason did not deduct it from the amount due de-
fendant, and because the court found defendant was not
entitled to recover on account thereof."

The issues now before this court, as stated by appellant,
are as to whether plaintiff practiced actionable fraud on the
defendant in the sale of said stock and loan business; wheth-
er the written contract of purchase and sale precludes the
appellee from recovering for the matters alleged; whether
appellee, by his conduct, waived his rights; whether appel-
lee's conduct, after the discovery of the fraud, creates an
estoppel; whether any damages were shown, and if so, the
measure thereof. Appellee states that the only issues now
are as to whether defendant proved the fraud alleged, and
whether he has shown damages by reason of said fraud.
The opinion and findings of the trial court, including a re-
view of the testimony, covering 60 pages of the abstract, are
set out. The findings are substantially as follows:

"The court is of the opinion and finds that there is no
waiver, or was no waiver, on the part of the defendant by
his conduct or payments, and no estoppel on his said right
of action for fraud. The court further finds that there was
no intention on his part to waive his right of action for said
fraud, and that plaintiff had no reason to believe that de-
fendant intended to waive his right of action; that it is
incumbent on plaintiff to show: (1) That the defendant
made the representations charged, and that they were rep-
resentations of fact, as distinguished from mere opinions;
(2) that such statements were false in fact, and that de-

fendant knew them to be false; or that they were made as of his own personal knowledge, whereas, he, in fact, had no knowledge of the truth thereof; or that he had the means at hand of knowing of their falsity; (3) that the representations were made with intent to deceive the party to whom made; (4) that the party to whom made did not know of their falsity, but, believing the same to be true, relied and acted thereon; and (5) that he was damaged thereby. That, in the opinion of the court, the main questions in this case are: (1) Has the defendant met the burden of proof which is upon him? (2) If he has, has he shown that he was damaged by reason of the fraudulent representations? That a large portion of the testimony is in hopeless conflict."

It appears from the evidence that plaintiff, in order to induce defendant to purchase the stock in question, made statements of fact, as distinguished from mere opinions, which were not in accordance with the true condition of affairs. There are some alleged false representations that defendant has failed to show by a preponderance of the evidence. The alleged representation as to the certificates of deposit's only drawing 4 per cent is difficult to determine. The plaintiff and his son testified that it was explained to defendant that some of the certificates drew 5 per cent and 6 per cent; the defendant and Rhoades testified that the representation was made that all the certificates drew 4 per cent. The defendant is supported to some extent by McCreery, who says:

"The Smith certificates were presented to me in the absence of Mr. Davis, and already figured at 5 per cent. I said I would prefer not to credit 5 per cent, without speaking to Mr. Davis about it. When Mr. Davis came in, the matter was explained to him. I think Mr. B. C. Dilenbeck said to Mr. Davis, 'Here is a matter which we have said nothing about, or which has not been explained,—these certificates were to bear 5 per cent interest.'"

On the other hand, defendant says he looked over the deposit register, and the record showed the certificates drew 4 per cent. Rhoades testified he also looked over the deposit register. If they had not examined the deposit register, the defendant might have established his claim; but having examined the deposit register, he was at least put upon inquiry from what appeared there. The register shows that, beginning with the year 1913, some certificates drew 4½ per cent, some 5 per cent, some 6 per cent. Under date of February 1, 1913, appears a deposit of $20,000 by S. S. Dilenbeck, marked in rate of interest column, 4 per cent, with a 6 in a circle above the 4; in regard to other deposits, the figure 6 appears in the rate of interest column; in others, 4½; in a large number of cases, the figure 4 appears in the column, with the figure 5 in a circle or parenthesis about it; in several instances, the figure 5 appears in the interest column, without any other figures or marks. Considerable stress is laid upon the two clauses in the contract in which it is guaranteed by the parties of the first part that the books and records of the bank will and do show the true and correct condition of the bank. The certificate of deposit register does not show the true and correct condition, in an entirety; it is kept in rather a peculiar manner, and in some instances, the certificate is registered at 4 per cent, when it draws more; but the court finds, in view of what it does show, that the defendant should have known that many of the certificates drew more than 4 per cent, and especially in view of the clause in the contract following the clause just referred to, wherein it is agreed and understood that the second party (defendant) guarantees to take care of and to pay, at such times as they may become due, or demand shall be made for their payment, on deposits, in accordance with their various agreements. The agreements are somewhat contradictory; but it would appear, from all the testimony, and from these agreements, that the defendant has failed to establish this

alleged fraudulent representation, by a preponderance of the evidence.

The court continues to the effect that it is shown by the evidence of both plaintiff and defendant that plaintiff refused to guarantee the payment of the notes, and from this it is urged that no representation as to their being good and collectible could be enforced. It cannot be inferred, from the fact that plaintiff refused to guarantee the payment of the notes, that he might not represent the notes to be good and payable, and further represent that they would not lose a dollar on them. There is nothing inconsistent with the refusal to guarantee, and the representation. On account of his age, plaintiff decided to sell the bank, and be free from all obligations; and he might not want to guarantee the payment of two or three hundred thousand dollars of notes, running to a large number of parties, in various amounts, some quite small. Some of the notes were to run as long as ten years, and many for a considerable length of time; and it is natural that, if the plaintiff was to stand back of the paper during the maturing of the same, he would want to control the collection thereof,—this is a mere matter of business. It is claimed that the defendant did not act as an ordinary and prudent man, under the circumstances. This claim is not shown by the evidence. Plaintiff did not wish to have the negotiations made public, until the trade was completed, and at his request, most of the meetings were at the plaintiff's home, or at the bank in the evening. Defendant was given no opportunity to investigate the matters connected with the business of the bank, without ignoring plaintiff's request. Furthermore, the deal was between the presidents of two banks; they were dealing with each other as bankers, and as such, they had a right to rely upon the statements made by each other. Defendant was a stranger in the community; the depositors and borrowers at the bank were strangers to him; the condition of the bank and the

loan business and the responsibility of the borrowers were peculiarly within the knowledge of plaintiff, who was, to a large extent, managing and conducting the bank; the matters represented as to the condition of the bank and the loan business and the reliability of the borrowers were matters that could not be readily and definitely determined from the books and papers in the bank, and it would require much time and investigation by a stranger, to get any definite idea as to these matters. It was natural that defendant should rely on the statements of the president of the bank as to such matters; and the court finds that the plaintiff made the representations as to the condition of the bank and the loan business and the value of the notes, or the reliability of the makers, substantially as alleged, except as to matters herein referred to. Defendant and Rhoades on the one hand so testified, the plaintiff alone contradicting them. The court finds that said representations were not in accordance with the truth, except as herein referred to; and that the defendant relied upon said representations, and had a right to do so, and was induced to enter into said contract of purchase on account of said representations, and was damaged thereby. The testimony of defendant and Rhoades, though varying somewhat, quite generally corroborates each other, and is reasonable and in harmony with the facts and circumstances surrounding the transaction. The testimony of plaintiff that defendant purchased the bank stock without any investigation, except a few questions, and that he acquired $200,000 or $300,000 in notes without inquiring carefully into the reliability of the makers, is unreasonable. It is clearly apparent, from the letters of the plaintiff, from the times of the meetings, and from the fact that plaintiff desired to keep the transaction secret, that defendant was relying upon plaintiff solely, as to the matters which were not clearly apparent from a careful examination of the papers. The court further finds that defendant is not entitled

to recover anything on account of the note given for dividends: the defendant was equally in possession of the facts as to this as the plaintiff, or could and should have been, and the matter was settled by note. There is a great difference of opinion in the testimony of some of the witnesses as to the amount of damage suffered by defendant. The difference as to other witnesses is because it was based on an entirely different state of facts. Much of the testimony on the question of damages is speculative. There are many elements which go to make up the value of the bank stock and the value of the loan business, such as the value of the notes held by the bank; the responsibility of the makers, guarantors, and endorsers, their ability to pay, and the like; the value of the securities connected with the loans; the condition of the business of the bank; the character of the persons dealt with; the manner of dealing with the persons who are customers of the bank, and the like; and as to the loan business, largely matters connected with the good will of the firm of Dilenbeck & Son, and their custom and way of making loans and disposing of them; their connections with the parties to whom they have sold their loans; the character of the paper, securities, and the like, sold to their connections; whether, when the loans come due, they will or will not be promptly paid; whether their connections in the east will be disappointed in the character of the loans and the securities they purchase; and the litigation that may necessarily result to recover or protect the loans. The evidence shows that the loan business rapidly increased in profits from $5,000 in 1911, to about $15,000 in 1915. The value of the loan business depends more upon the character of the business transacted, as to whether permanent or speculative. The evidence shows, to some extent, that the old, conservative manner of handling the business had been abandoned, and that quite a large amount of the dealings had been in connection with loans and mortgages of the Perry

Town Lot & Improvement Company, and upon city property in Des Moines and elsewhere, which were not of a substantial and conservative character. The more hazardous the loan, the greater the commission; but the business itself decreases in value. There is considerable evidence showing a loss upon some of the notes held by the bank, at the time defendant purchased the stock. The value of the loan business depends greatly on the foreign connections, and if the business has been so conducted in the last few years that, when these foreign people become fully acquainted with the facts, they will lose faith in the business, it will greatly damage it. The evidence shows that the bank's business, in some respects, has not been handled as carefully as represented; that the papers and securities, in some respects, were not as good as represented; that the loan business, in some respects, has been badly handled. The court is of the opinion that the proper way to arrive at the damages is to take into consideration all these matters and the character and nature of the business and of the assets and their value and the value of the business in the condition in which the business actually was, and the value as it would have been if it had been as represented. The defendant paid $150 per share, which was $50 above par. He paid a sound price, and was entitled to a sound business, as represented. The court finds that, if the stock and the business and the assets of the bank had been as represented, it would have been reasonably worth $150 per share; but the business and the assets of the bank and the loan business were not as represented, altogether, and the measure of damages would be the difference between the $150 per share paid, and the value per share as the business and the assets actually were. If the damages were confined to the damages actually suffered, and shown positively by the evidence, it would be difficult to do justice between the parties, and it might be years before the full extent of the damages could be accurately ascertained, as to

the loss in dollars and cents. The letters from one of the eastern connections show that, up to that time, the relation as to that connection had been satisfactory. They also show how difficult it is to obtain and hold a connection, and that the connection was not turned over to the defendant, but was left with only a probable connection with the bank; so that damages cannot be definitely ascertained in reference to the loan business, unless the rule is applied as stated. In the court's opinion, such rules should be applied in this case. It is difficult to determine the actual value of the stock as it actually was at the time of the transfer. Defendant's opinion is that it would not exceed $90 per share, and that the loan business would not exceed $5,000, in the condition he actually received it; witness Rhoades testified, in answer to a hypothetical question, based on the facts disclosed by the evidence (but not entirely so), that it would not be worth more than 95 cents on the dollar, and that the loan business is worth what its good will is worth. Plaintiff testified that, if he had expected to continue in the banking business, he would not take $50,000 for the loan business. Plaintiff and his son gave the value, including the loan business, at 175 to 200. Another witness gives the value at 135 to 140, but says that it would hurt the loan business, to some extent, if the connections became dissatisfied, upon learning the true condition of the loan business. (In this connection, we may state that, where there were mortgages or securities upon vacant lots, upon which mortgagors had agreed to build houses, but had failed to do so, the value of the vacant lots was about one fourth the amount of the mortgages, and that plaintiff had not informed their eastern connections as to this situation.)

The court continues: Another witness gives the value at 150 per share, but he did not take into consideration all the circumstances disclosed by the evidence; another witness says, 115 to 120 per share, and says that, if a large num-

ber of the loans were inadequately secured, made to irre-
sponsible people, and close to the full value of the real estate,
it would depreciate the value of the business to a purchaser
a great deal. The answers of the experts do not purport to
be based on the full knowledge of the actual condition of the
business. The value lies somewhere between the witnesses'
statements. The court believes, from the evidence, and so
finds, that a fair and reasonable value of the stock, includ-
ing the loan business, as it actually was at the time of the
transfer, would be $125 per share, and that defendant is
entitled to recover the difference between the actual value,
of $125 per share, and the value of $150 per share, as rep-
resented, less the amount due on the note sued upon, and
said note canceled.

The foregoing is a clear statement of the facts; and,
after a careful reading of the record, we reach the same con-
clusion. It is largely a question of fact. It would take
many pages of the opinion for a detailed recital of the evi-
dence. This we shall not attempt to do. The negotiations
were conducted, for the most part, when defendant and
Rhoades and the plaintiff were present. Defendant and
Rhoades testify as to the representations. Plaintiff denies.
The two testify that plaintiff took each note from the note
case, showed it to the defendant, and stated, in substance,
that the notes were good, and the makers good, and that the
bank would not lose a dollar. This is all denied by the
plaintiff. The plaintiff was acquainted with the makers of
the notes, and their financial standing. He was the man-
ager of the bank, and the business was conducted under his
personal supervision. The record shows, in great detail, the
testimony of the different witnesses in regard to the ques-
tioned notes. There were losses on some of the notes. Ap-
pellant argues that others of them are collectible. We are
satisfied that some are not, and that others are not as rep-
resented. Some are in litigation; others are on vacant lots,

where houses had not been built, as agreed, the value of the lots being less than the security. It is unnecessary to go further into the evidence.

1. The first, or option, contract, entered into in September, 1915, provides:

"It is further understood and agreed between the parties hereto that the parties of the first part

1. FRAUD: fraudulent representations: non-waiver.

(appellant) shall be relieved of all responsibility in connection with said business, and are not to become or be held personally liable to said bank, or second party in any manner whatsoever, except as pertains to a certain note of Musselman, for $3,000.00."

Substantially the same provision, though worded somewhat differently, is in the contract which was later entered into. It is contended by appellant that the meaning of this clause is that appellee has waived all his rights whatsoever against the appellant, for the sale or purchase of said stock, and that the only remedy appellee has is on the following clause in said contract:

"It is further agreed and understood that parties of the first part guarantee the books and records of said bank will and do show the true and correct condition of said bank, and all accounts thereof, on the date of taking possession thereof by the party of the second part."

The claim is that, by signing said contract, appellee can only maintain an action for breach of warranty or guaranty, and that, as appellee has not based his action on breach

of warranty, he cannot recover. No author-

2. FRAUD: fraudulent representations: evidence: notes held by bank: refusal to guarantee.

ities are cited by appellant to sustain the proposition. We think, as held by the trial court, that there is nothing inconsistent with plaintiff's refusal to guarantee the notes, or the condition of the bank, and the repre-

sentations. This action is based upon fraud, which vitiates

everything.  There are cases in the books where a person may sue in one count for breach of warranty, and in another count for fraud and false representations.  It is said by appellant that, if we do not accept appellant's foregoing view of the matter, then it will be necessary to consider what representations were made as to the notes.  This will be referred to later.  Appellant also argues briefly that there was a waiver and estoppel, because defendant had access to the books of the bank, by defendant's making payments on the notes he gave to plaintiff, and proceeding with the contract after he knew of the fraud, or some of the circumstances constituting the fraud alleged.  It should be said here that he claims he did not discover all the discrepancies and conditions until April, 1917.  But we think there was no waiver.  The defendant had the right to rescind the contract, or to perform it and recoup his damages for the fraud.  Under the evidence, defendant did not have access to all the books.  It is true he made some examination of the certificate of deposit register; but the trial court found against him, as to the rate of interest shown thereby, and defendant has not appealed.  It is also contended by appellant that any representation made by him was innocent and through mistake, and that, therefore, he is not liable; but the evidence does not bear him out in this contention.

3. FRAUD: fraudulent representations: remedies: rescission or damages.

4. FRAUD: fraudulent representations: evidence: sufficiency.

2.  It is next contended that the representation alleged to have been made by plaintiff, that the bank would not lose a dollar, was only an opinion—plaintiff's judgment.  There is more to the representation than the statement that the bank would not lose.  We shall not now repeat the exact language, but the substance of it is that, so far as the notes were concerned, they were good; that the makers were good and responsible; and that

5. FRAUD: fraudulent representations: opinion or fact: expressions as to value.

the bank would not lose, etc.; and other statements in regard to the general condition of the bank and the loan business. It has been held that the expression of an opinion as to value ordinarily will not constitute fraud; but, where false representations were intended to be taken as a fact, and the parties do not have an equal opportunity to ascertain the truth or falsity thereof, then such opinion becomes actionable. *Van Vliet Fletcher Auto Co. v. Crowell*, 171 Iowa 64; *Dorr v. Corey*, 108 Iowa 725, 733; *Mattauch v. Walsh Bros.*, 136 Iowa 225.

6. FRAUD: fraudulent representations: opinion or fact: financial responsibility of third person.

Courts generally hold that statements as to the solvency or financial responsibility of a third person are statements of fact, and not a mere expression of opinion. *Farmers' Sav. Bank v. Jameson*, 175 Iowa 676. We think the representations here were more than a mere expression of opinion.

3. As said, appellant argues that he had no knowledge of the condition of the books of the bank, as he had done no clerical work thereon; and that any misrepresentation was an innocent one; and that there was no intent to defraud. The record does not bear out appellant's contention. We have said, in some of the cases, that it is difficult, ordinarily, to prove the intent by direct testimony; the intent may be inferred, but this presumption or inference is not conclusive. There is evidence that plaintiff had knowledge of the falsity of the representations, at least as to many, and the more important of them. Aside from this, some, and the representations in regard to the more important facts, in regard to the condition of the bank, bearing on the value of the stock, were made by plaintiff as true, and within his own knowledge. Indeed, plaintiff not only represented that such facts were within his own knowledge, but the contract itself, a part of which

7. FRAUD: acts constituting fraud: representing facts within knowledge: estoppel.

has been before quoted, guarantees that the books and records of the bank show the true condition. We think this has some bearing, though the action is not on any guarantee. Plaintiff having represented that the facts were within his own knowledge, and it being shown that such representations were false, and defendant having relied thereon, and been deceived thereby, to his damage, plaintiff may not now be heard to say that he had no knowledge upon the subject, and that defendant should not have been deceived. Among the cases so holding may be cited *Riley v. Bell*, 120 Iowa 618; *Severson v. Kock*, 159 Iowa 343.

4. Appellant's argument is directed very largely to the two main propositions which we have discussed, in regard to whether there was any fraud practiced upon defendant by plaintiff, and as to whether defendant was damaged thereby. We have referred to such matters somewhat in detail. The argument as to the amount of the damages awarded by the court is very brief. The substance of the argument is that the damages allowed, even if fraud and deceit were practiced, are excessive and exorbitant, and are not sustained by any competent proof; that the evidence of one of the witnesses is that the books, on the face, showed the value of $1.07, but they say that it was not even that much; that the bank has paid dividends for 20 years, and that it was not in bad condition. They cite no cases on the question of damages. We appreciate the difficulty the trial court had, and that we have, in arriving at the correct amount of damages. In many cases, it is difficult, or impossible, to do so exactly. It should have been stated that witness McCreery, who seems to have been thoroughly competent, and conversant with the bank and the bank's business, testified:

8. FRAUD: fraudulent representations: damages: value of bank stock.

"The actual condition of the profit account of the bank, as shown by the computation, shows a loss in the profit ac-

count of $3,355.80.   The profit account, instead of having a
credit, as shown by the books, of $4,234.04, actually had a
loss of $3,355.80, which makes a difference in the actual val-
ue of the assets of the bank, as shown by that statement, of
$10,322.97 less than the statement showed, or whatever that
total is."

We think the rule or measure of damages adopted by
the trial court does justice between the parties, and that the
amount fixed is, under the evidence, as near right as it can
be.   Appellee cites the following cases to sustain the rule:
*Warfield v. Clark,* 118 Iowa 69;   *Smith v. Packard & Co.,*
152 Iowa 1;   *Campbell v. Park,* 128 Iowa 181, 185;   and other
cases involving the question of fraud in the sale of lands;
also, 1 Sutherland on Damages (3d Ed.) Sections 107, 113,
120, 121.

After a careful examination of the record, it is our con-
clusion that the decree of the superior court is right.—*Af-
firmed.*

LADD, C. J., WEAVER, EVANS, and GAYNOR, JJ., concur.

SALINGER, J. (dissenting).   The vital thing in the ma-
jority opinion, as I construe it, is an alleged representation
by defendant that the notes sold by the bank were good and
payable, and that not a dollar would be lost on them.   The
defendant did guarantee to take care of the deposits.   He
declined to guarantee that the notes were good and payable,
and that not a dollar would be lost on them.   The majority
declares that this refusal to guarantee is immaterial.   In
my opinion, the fact that the deposits were guaranteed, and
a guarantee as to the said quality of the notes was declined,
shows that the alleged representation as to the notes was
the pure expression of an opinion.   And it must not be
overlooked that they are claimed to have been made by a
banker, selling to a buying banker.   As said, while other
things seem to be relied on, this alleged representation as to

the notes seems to be treated as vital. I think it should be treated as a nonactionable expression of an opinion, and that there should be a reversal.