Henry Faust, Appellee, v. Clifton M. Parker et al., Appellants.

**NEW TRIAL:** Verdict—Passion and Prejudice. Evidence reviewed, in an action for damages resulting from the fraudulent sale of corporate stock; and *held* that verdict was so excessive as to show passion and prejudice.

*Appeal from Chickasaw District Court.*—H. E. Taylor, Judge.

MAY 13, 1924.

Action at law, to recover $50,000 for alleged fraud and deceit in the sale to plaintiff of $50,000 of stock in the North American Fire Insurance Company. Trial to a jury. At the close of plaintiff's evidence, the court sustained defendants' motion for a directed verdict as to the bank. The jury returned a verdict for plaintiff for $50,000, with interest at 6 per cent from July 15, 1919. This was reduced by various remittiturs and by the court, so that judgment was finally rendered in favor of plaintiff and against Parker and Himes for $37,000 and costs. Defendants appeal. Plaintiff has also appealed from the action of the court in directing a verdict for the bank. Defendants will be referred to as appellants.—*Reversed.*

*Mears & Lovejoy* and *Condon & Clary,* for appellants.

*Hurd, Lenehan, Smith & O'Connor,* for appellee.

Preston, J.—It is charged that there was a conspiracy between the defendants and six or seven other persons named, stock salesmen and one or two officers of the insurance company, to induce plaintiff to purchase stock in the company, and to

make certain representations to plaintiff for that purpose; that
the conspiracy included a scheme to induce plaintiff to give notes
and mortgages for the purchase price of the stock, and that de-
fendants would offer to finance the transaction. It was also
alleged that the stock subscribed for by plaintiff was resale
stock, belonging to the agents; that plaintiff gave notes for the
full amount of the $50,000 so subscribed, $20,000 of which was
secured by mortgage; that the stock was worthless, and that
plaintiff was damaged in the sum of $50,000; that a fiduciary
relation existed between plaintiff and defendants Parker and
Himes, who knew that plaintiff had little experience in business
and no knowledge of promoting insurance companies or the
purchase or sale of stock therein; that, in July, 1919, defendants
made certain representations to plaintiff whereby he was induced
to purchase, at two different times in said month, 100 shares of
Class B stock in said insurance company, or an aggregate of
$50,000 for the two purchases; that the representations were
false and fraudulent; that defendants had a secret interest in
the transactions, whereby they were to receive a profit out of
the same.

Defendant Parker is president, and Himes cashier, of de-
fendant bank. The plaintiff was vice president of a bank at
Waucoma; was a member of the board of directors and a mem-
ber of the examining committee for nine or ten years before the
transaction in question, and transacted nearly all of his bank-
ing business at his own bank in Waucoma; borrowed money there
a good many times, and on one occasion more than $6,500;
loaned money to people; owned two farms, and leased some of
his land, and drew some of his own leases. At one time, 10 or
12 years before, he had a small checking account, amounting to
$250, in defendant bank, then in charge of Parker. This was
the only checking account he ever had in Parker's bank: At
one time, he had about $150 in certificates of deposit in defend-
ant bank; bought some Liberty Bonds at the bank, during the
war, because Parker was connected with the board which was
taking subscriptions for war enterprises; at one time borrowed
$40, and at another time $60, from defendant bank. Aside from
these matters, he had no connection with defendant bank at all.

The record is large, and many propositions are argued pro and con in elaborate and well prepared briefs.

Plaintiff testifies that he was greatly defrauded by different stock salesmen. Shortly before this transaction, he had subscribed and given his notes for $60,000 for stock in another concern, and a short time after, he had subscribed and given his notes for $50,000 of stock in still another concern. He testifies repeatedly that he would be unable to pay the notes given for the stock involved in this case; and that he would be ruined, unless the stock was resold, as some of the salesmen agreed to do, before his notes matured; and that he would not have purchased the stock, but for such agreement. He qualifies this somewhat, in some instances, by saying that he would not have purchased this stock but for the statement by Parker that the stock was all right, or if he had known of the alleged secret agreement by which Parker and Himes were to profit by the transaction. Plaintiff's claim is that it is shown circumstantially that Parker and Himes were to receive a percentage amounting to $4,500 of the $20,000 notes and mortgages given by plaintiff and placed or floated by said defendants. Appellants' contention at this point is, as we understand it, that this arrangement was made after the stock transaction was completed.

1.   While, as said, many propositions are argued, appellants seem to stress most strongly the proposition that, even if it be conceded that plaintiff is entitled to recover at all, the verdict is grossly excessive, and the result of sympathy for plaintiff, and of passion and prejudice, and that the verdict and judgment should be set aside. We are of opinion that this point must be sustained, and that the verdict is so excessive as to clearly indicate passion and prejudice, and that it was not cured by the reductions by plaintiff and by the court.

But one witness testified as to the value of the stock, a young man 25 years of age, living in Des Moines, auditor and accountant of the North American Fire Insurance Company, in the insurance business five years, with that and other companies, one of which was located in San Francisco. He says he has made some study and observation with regard to insurance stock, especially with regard to promoted insurance companies; is acquainted with the value of insurance stocks *of that char-*

*acter* during the year 1919. The evidence of this witness will be referred to later. The insurance company in question was being promoted at the time plaintiff subscribed for the stock. As we shall see in a moment, it made a good showing of the condition of the company at the time in question. It seems not to have been well managed thereafter. The plaintiff did not introduce evidence to show the assets, extent of the business, financial condition, and the like, of the insurance company at that time. The defendants introduced evidence on that subject. It is contended by appellants that plaintiff's witness on value did not qualify to speak to the question of values; that there was no proper evidence as to value, and no guide, in the evidence, for the jury. It is also contended by appellants that the court, by its instructions, did not adopt the proper rule for the measure of damages. The rule given was that the jury should take the difference between the price paid by plaintiff for the stock and the actual market value of said stock at the time of purchase, in case the jury should find that it had a market value at that time; that, if it had no market value, the jury should determine what was its true value, and allow plaintiff the difference between such true value and what he actually paid; and that, in determining such true value, they might take into account the corporate assets, dividends paid, the character and permanency of the business, the control of the stock, and so on. Appellants offered an instruction on this subject, to the effect that the measure is the difference between the market value of the stock at the time of the purchase and what it would have been worth if the representations, in case any were made, had been true. In the same instruction, appellants asked the court to say that there was no competent evidence in the case, under such rule. To sustain their position that such is the rule, in a case for deceit, they cite *Stoke v. Converse,* 153 Iowa 274; *Gray v. Sanborn,* 178 Iowa 456; *Workman v. Bales,* 190 Iowa 1061, 1066; *Ross v. Bolte,* 165 Iowa 499, 507. And that this is the rule in the sale of corporate stocks, they cite *Dilenbeck v. Davis,* 186 Iowa 30; *Warfield v. Clark,* 118 Iowa 69; *Boddy v. Henry,* 113 Iowa 462 (53 L. R. A. 769). Appellee concedes that this is the rule, as stated in the *Warfield* and *Dilenbeck* cases, but they say that defendants cannot complain if plaintiff offers no evidence

of the represented value from which to subtract the actual value, but accepts instead the difference between the agreed value (what he actually paid) and the actual value (citing *Davis v. Walker,* 191 Iowa 1268; *Deetkin v. Scholes,* 193 Iowa 551, 555). It is further contended by appellee that, where the stock has no ascertainable market value, its actual value must be taken, in determining which the value of corporate assets, dividends paid, and other circumstances of like nature may be taken into consideration (*Bryan & Co. v. Scurlock,* 190 Iowa 534, 540); that the question is not what the stock would sell for by practicing deceptive arts (*Bryan & Co. v. Scurlock,* supra; *Hubbell v. Meigs,* 50 N. Y. 480); and finally, that, where the stock is unlisted and sales are infrequent and it is doubtful if it has a fixed market value, other methods of fixing value may be resorted to (*Armstrong v. Rachow,* 205 Mich. 168 [171 N. W. 389, 391]). Without discussing the cases, it is enough to say that, under either rule, or any phase of the evidence, the verdict is grossly excessive.

Referring now to the evidence of plaintiff's witness as to value, he says that, in arriving at a judgment about the value of any particular insurance stock, the elements to be considered are the amount of securities, the book value,—in other words, the mortgage value,—and its earning power,—power to declare dividends; also, the history of the other conditions, and the experience of the other companies.

"During 1919, I knew that the North American Fire Insurance Company was being promoted. In 1919, I was acquainted with the value of insurance stock, promoted companies, in Iowa. I am able to say, from investigation and experience, whether a company in the stages of promotion, before it commenced to allow dividends, has any market value. Stock is never listed on any market while it is in the promotion period, such as this was in 1919; value of stocks is usually fixed by exchange upon the market. I am acquainted with the market value of the shares of stock of this company in July, 1919.

"Q. What was its market value? A. None. Q. Did it have any value for investment purposes? If so, what? A. It did; $50 a share."

On cross-examination, he said that this stock had a value in

the summer of 1919; that it did not have any market value, because it was not listed on any of the stock exchanges of the country; that, in some cases, the value of anything is established by what it happens to be selling for; that the market value of anything is what it sells for to people who want to buy, and by people who want to sell; that during the promotion period the stock is not worth all that is paid for it, less promotion expenses, as an investment; that if, in July, 1919, this company had ceased to do business, and liquidated the stock that had been subscribed and paid for, it would have been worth exactly what was paid for it, less the expense of the campaign; that, from the experience of companies, it takes ten or twelve years to gain back what they lost in promotion expenses, and get in shape to earn dividends; that this company paid a 6 per cent dividend, two or three years after it commenced to do business; that that was much sooner than the average; that, if they were doing a fire business alone, they could not declare a dividend, but if they made their profit on some short-term business, such as hail, it would be a different proposition; that the Hawkeye company was a promoted company, just like this one, and it paid a dividend the third or fourth year; that there is no difference in the value of stock for investment purposes of a company able to pay dividends three years after it is organized, and one that is unable to pay dividends for ten or twelve years.·

It is claimed by appellee that this company did have hail business, which permitted the payment of a dividend.

It may be well to refer, as briefly as may be, to some of the circumstances showing the financial condition of the insurance company, which, under the instructions, were proper to be considered, as bearing upon the value of the stock. At the time of this purchase, the company was in process of organization. It had not commenced to do business as an insurance company, but was contemplating doing so as soon as the organization was completed. The promotion expense was about 25 per cent of the total amount of stock sold. The first series, or A, was sold at $200 per share, and Series B at $250 a share, the change of price having been made shortly before plaintiff purchased his stock. There was also a series to be known as C, which was provided for by resolution, and which was to be sold at $300. Soon

after plaintiff purchased his stock, and at the close of the pro-
motion period, the company owned approximately $220,000 of
securities in the form of first-mortgage real estate loans;
$468,000 in Liberty Bonds, then somewhat below par; certifi-
cates of deposit, $220,000,—a total of about $900,000,—all of
which were recognized by the insurance department as permis-
sible. The company also owned subscription notes in the sum
of $275,000, and about $9,000 cash in bank. It had on deposit
with the insurance department about $590,000 of approved se-
curities, which was more than $50,000 in excess of the paid-in
capital stock of the company. It is not shown that at the time
plaintiff bought his stock, the company was not honestly pro-
moted, or that the organization was not sound. In this connec-
tion, it is contended by appellants that the alleged statement
of Parker that the stock was all right, was true; but we shall
pass that. The jury necessarily found that the stock was of no
value. On no theory of the evidence is such a finding war-
ranted. The verdict, computing the interest, was practically
$60,000. The instructions of the court did not authorize the
jury to add interest. Plaintiff's witness on value testified that
plaintiff's stock was worth $50 per share, for investment pur-
poses, or $10,000. On that theory, the verdict was $20,000 too
much. Appellee seems to have conceded that the verdict was
too large, and remitted down to $40,000. The trial court made
a further reduction; but the reason for fixing the amount at
$37,000 is not reflected in the record. The witness also said, in
effect, that, at the time plaintiff purchased his stock, it was
worth what he paid, less 25 per cent expense for promotion. It
is appellant's contention that on this theory the verdict could
not have been, in any event, for more than $12,500, and that
the financial condition of the company at the time plaintiff pur-
chased his stock should be taken into consideration. It is clear
to us that the case must be reversed, on the ground that the
verdict is excessive and the result of passion and prejudice. A
verdict against the bank for a like amount, had the case been
submitted to the jury as to it, would necessarily, for the same
reasons, work a reversal.

At this point we are met with the troublesome problem as
to how far we should go in passing upon and determining other

questions presented. Conceding the desirability of passing upon all such questions, that the law of the case may be settled, it is not practicable to do so, for the reasons to be stated. To settle the law of the case would necessitate a discussion of all questions. To do less than that would leave questions not discussed undecided. There are forty-nine assignments of error, some of which are subdivided. Thirty pages of the printed argument of appellants are taken up with their printing, and this is met by appellee with about the same number of pages. To state them alone, without discussion, would require an excessively voluminous opinion. In some cases it is desirable, upon a reversal and retrial, that the court should not discuss or comment upon the evidence. On a retrial the evidence might be different, and require the application of other legal principles. Under the circumstances, we think it is not only impracticable, but not advisable, to pass upon the other questions. We do not pass upon them.

What has been said disposes of plaintiff's cross-appeal.

For the error discussed, the judgment is reversed, and the cause remanded.—*Reversed and remanded.*

ARTHUR, C. J., EVANS and FAVILLE, JJ., concur.