ALBERT PETERSON, Appellant, v. GEORGE W. HIGGINS et al., Appellees.

**FRAUD: False Representations—Values.** Representations of *value* will
1 be treated as representations of *fact*, when so intended.

**SPECIFIC PERFORMANCE:** Contracts Enforcible—Inequitableness.
2 Equity will not specifically enforce a contract unless it will be strictly equitable so to do.

*Appeal from Winneshiek District Court.*—H. E. TAYLOR, Judge.

NOVEMBER 14, 1922.

SUIT in equity, to compel specific performance of a contract for exchange of properties and assumption of a certain mortgage incumbrance and the payment of $900 difference by defendants. Defendants alleged inducement to enter into the contract, by fraudulent representations made by plaintiff. Defendant Mary Higgins also prayed, in a cross-petition, that her title to her property be quieted against plaintiff. The court found the equities with defendants, and entered a decree quieting title, as prayed. Plaintiff appeals. Facts appear in the opinion.—*Affirmed.*

*E. W. Cutting,* for appellant.

*E. R. Acres,* for appellees.

ARTHUR, J.—The contract sought to be enforced, if there is one, is found in correspondence between appellee George W. Higgins and appellant, Albert Peterson. On February 21, 1919,

Peterson wrote to Higgins a letter containing
propositions as follows:

1. FRAUD: false
representations:
values.

"I am in receipt of yours of the 19th inst. in regard to the proposition that I would put up to you on your livery barn and will say that while there is not much use for me to put any proposition up to you as we do not seem to be able to get together, however I am going to make you one that is right in every way and I do not see how you can turn it down. That is, I will trade you the following tracts of lands:

"Lots 3, 5 and 6, SW¼ of SW¼ of Sec. 28-159-91, Burke County, N. D., containing 148.80 acres, bordering on a good lake, which makes it a fine stock proposition, land is wild but soil is good. Located three miles from Lunds Valley, N. D. The value of this land is honestly cheap at $3,000 incumbered at 6 per cent, from January 5th, 1919, equity, $2,200.

"Lot 4 of Sec. 4 Twp. 160-92 and S½ of SW¼ of Section 35-161-92, Burke County, N. D., containing 122.41 acres. This land is located in a good neighborhood and the soil is very good. Located six miles from the town of Lignite, N. D. My price, $2,500, subject to mortgage of 6 per cent, from Sept. 16, 1918, $600, equity $1,900.

"SW¼ of NE¼, S½ of NW¼ of Section 2, and SE¼ of NE¼ of Sec. 3, all in Twp. 152-86, Ward County, N. D., containing 160 acres. Located seven miles north of Ryder, N. D., price, $4,000. Incumbered 6 per cent mortgage due in five years $800. Incumbered balance due in three years $400, $1,200. Equity, $2,800.

"Now I will tell you what I will do with you on this deal. I will trade you my equity in these three tracts for your barn and $900 either cash or note which is certainly giving you a good deal.

"If you say this is a deal I will send you a contract signed and then we can close the deal at any one of the banks in your city which you may designate as we will have to get our abstracts down to date showing good title or you can have the contract drawn down there and sent it up here for me to sign as you will have enough of the details in this letter so that you can have the contract drawn. I will pay all interest to date on in-

cumbrances and of course it is understood that I will pay all taxes on my property to date and you will do the same.''

The ''livery barn'' property mentioned in the foregoing proposal is the E½ of Lot 7 in the S½ of Block 12, in the original town of Decorah, Iowa, owned by appellee Mary Higgins.

Upon receipt of the above quoted letter, George W. Higgins wired Peterson:

''Will you take $800 cash. If so, deal closed, make out papers. Answer.''

On receipt of the telegram March 10, 1919, Peterson wrote George W. Higgins:

''I am in receipt of your message offering me $800 cash difference on the trade but will say that it is impossible for me to make this deal with you on these terms as I have the land in at too low figures but will stay by my proposition. If you want it at $900 difference send deed and money to this bank with instructions and I will get my deeds and abstracts out and forward to your bank and we will close this deal up. I am certainly giving you a good deal on this as you will find out in time.''

Two days later, Higgins wrote Peterson:

''Yours received this morning and will say you can get your deeds and abstracts out at once and forward to the State Bank of this city and we will have by that time the deed of barn and everything drawn up to date and signed by my wife and money awaiting amounting to $900, and the deal is closed. I wired you as myself and wife thought $800 was a good plenty. With best wishes from myself and wife. Frank Adams has gone to Canada for a few days and will be back in a week or so. He went Monday I think. I told him last week we had nearly closed the deal for the barn.''

In reply, on March 13, 1919, Peterson wrote Higgins:

''I am in receipt of yours of the 12th inst. and will accept your last proposition of $900 cash and the livery barn as mentioned in former letters and I will get my abstracts and deeds ready and you may do the same and we will close this deal. You certainly are getting a good deal this time but that is all right as we may trade later on something else as you suggest in your letter.''

Plaintiff claims a contract for exchange of properties made out by the foregoing correspondence, and tendered performance on his part, and prayed that defendants be compelled to perform the contract on their part by conveyance to him of the "livery barn" property and the payment of $900 in cash.

The answer set up defenses that there was not a completed contract; that the letters written by George W. Higgins were written by him on his own responsibility, and were not authorized by Mary Higgins, owner of the "livery barn" property in Decorah; and that they were induced to enter into the contract claimed by Peterson, by fraudulent representations made in regard to the location, soil, and quality of the North Dakota lands. The fraud issue was the one principally contested in the trial below, and the important issue here presented.

We think it is established in the record that George W. Higgins was the agent of his wife, appellee Mary Higgins, authorized to conduct the correspondence as he did, and that by such correspondence the contract claimed by appellant was made. This leaves for consideration and determination the charge by defendants that they were induced to enter into the contract in question by representations made by plaintiff which they claim were fraudulent. There is a large volume of testimony presented on the fraud issue by both parties. It is the ordinary case of fraudulent representations, not materially different from many cases where it is claimed that a contract for sale, exchange, or trade of properties was procured by fraudulent representations as to the location, value, soil, and quality of the land.

The answer of defendants, alleging that they were induced to enter into the contract in question by false representations as to location, value, soil, and quality of plaintiff's land, contained all the necessary allegations of fraud. We have examined and considered the evidence carefully, and have no hesitancy in approving the finding of the lower court that, on the issue of fraud, the equities are with the defendants. The three tracts of land which Peterson was to convey to perform his part of the contract are located in what the witnesses call the "hill country," and two of them in Burke County, North Dakota, and one in Ward County. Representations concerning the lands made by Peterson individually are in writing. It is claimed by

defendants that one Adams was the agent of Peterson, and made some representations concerning the lands. This is denied. We will notice the representations made by Peterson himself. Witnesses designate the tracts of land in their testimony in the order in which they are mentioned in Peterson's letter stating his propositions of exchange, as the upper tract, containing 148.80 acres; the middle tract, containing 122.41 acres; and the lower tract, containing 160 acres. The upper tract had resting on it an incumbrance of $800; the middle tract, $600; and the lower tract, $1,200. The value of the upper tract was represented to be $3,000. Peterson stated that "the value of this land is honestly cheap at $3,000." Concerning the upper tract, Peterson stated that the "soil is good and located three miles from the town of Lunds Valley." Concerning the middle tract, Peterson represented:

"This land is located in a good neighborhood and the soil is very good. Located six miles from the town of Lignite."

No special representation was made as to the lower tract, in Peterson's first letter to Higgins. In other letters, Peterson, speaking of all three of the tracts, said: "I have the land in at too low figures," and "I am certainly giving you a good deal," and "you certainly are getting a good deal this time, but that is all right as we may trade later on." In his proposition to defendants, Peterson wrote, in regard to the Higgins property, "You have not priced any too high, possibly not high enough in my estimation," and mentioned "your friend," Frank Adams, with whom Peterson had participated in land -deals somewhat similar to the one involved in this case. Peterson represented the value of the three pieces of property to be $9,500. The incumbrance on the three pieces aggregated $2,600. It is argued by counsel for Peterson that the statements as to value were expressions of opinion only. Defendants had never seen the land. We think from the whole record that the defendants understood that plaintiff knew the market value of the land, and that the statements and representations which he made as to the value of the land were made as facts, intending that defendants should believe and rely thereon; and it is evident that defendants did believe and rely thereon. We said, in *Hetland v. Bilstad*, 140 Iowa 411:

"Statements of value or of quality may be made with the purpose of having them accepted as of fact, and, if this is done and so relied on, they are to be treated as the parties designed they should be, namely, representations of fact."

See, also, *Hise v. Thomas*, 181 Iowa 700; *Murray Bros. v. Keesey*, 183 Iowa 739.

Plaintiff and his two witnesses B. W. Taylor and O. S. Haugen place the value of the upper tract the same as Peterson, about $20 an acre. Taylor and Peterson had been in the land business together for about five years, and at the time the evidence in this case was taken, owned land in that section of the country together. Haugen was a stockholder in a bank of which B. W. Taylor was president.

A. H. Lundquist, a banker in Burke County, testified for Peterson as to the value of the middle tract, and placed the market value in the spring of 1919 at $1,200. Peterson placed it at $2,500. Lundquist testified:

"No one has lived on this particular tract of land since Klotz lived there."

Klotz was the homesteader, and soon abandoned the land. Lundquist said that, "in March, 1919, real estate was at a standstill, and people were not buying. We had had five poor years."

As to the lower tract, Peterson alone testified, placing the value at $4,000, the same as in his proposal to Higgins. Peterson and his witnesses did not go into particulars as to the soil and character of the land. Peterson had lived and operated in land transactions in that country for many years, and knew about the soil and lay of this land.

Defendants produced witnesses, Joseph Prince, J. B. Donovan, A. U. Anderson, F. E. Heckel, William Scheffelbein, Sr., and William Scheffelbein, Jr., as to values of the several tracts and as to the location from towns, and the soil and character of the lands. These men had lived in the vicinity of the land in question for a number of years, and were familiar with it. Joseph Prince, a farmer, who had lived in the vicinity of the land in question for 15 years, and owned a farm in that locality, testified that in Burke County there is a flat country and the hill country; that the hill country, where the land in question is located, was homesteaded about 18 years ago; that the great

majority of the homesteaders, after proving up, abandoned the land; that he knew the upper tract of land in question, containing about 120 acres; that it is 11 miles and 80 rods from the town of Lignite; that he had the land rented in 1919 for $35 for the whole 120; that there is a lake or pond on the land, covering about 27 acres, and two smaller lakes, covering 5 or 6 acres; that there are some steep hills on the land, and some clay land; but that it is nearly all sand and gravel, and covered with rock. He placed the value of 80 acres of the land at $400, and of the other 40, at $100. He said that land had not been selling in that country during the last three years prior to 1919.

Donovan was a merchant in the town of Bowbells, about 15 miles from the land in question. He designated this land as the "hill country," and said it was covered with "hard-edged and granite rocks," and that the only thing he would consider the "hill country" good for would be grazing. As to the rocks, he said: "I think a lot of it you could walk over and step from one rock to the other." He said that, in his opinion, Burke County should not have been opened for farming purposes; that he had not known of land's selling in the "hill country" for a number of years; that some of the lakes in the hill country were salt water, and most of them alkali; that the water in the large lake on the property in question was "hard and alkali,— it is not good for stock;" that the surface of the land was sandy and gravelly and rocky; that he noticed coulees or ravines between the hills, and a few willows growing in the coulees; that he considered the "rocks scattered over the ground pretty thick for cultivation;" that what grass there was there was mostly wire grass.

Speaking of the upper tract, Donovan testified:

"I do not consider it has got any cash value. I wouldn't want to take it and pay the taxes on it. For someone who wanted the land for grazing, it might have some value. What that value is, I don't know."

Anderson's testimony as to the sand and gravel and rock on the upper tract was practically the same as Donovan's. Anderson said:

"The land, if anything, is good for grazing; and it is not

good for that, because a person who is going to use it for graz-
ing could not get enough out of it to pay the taxes, which would
be $50 or $60 a quarter. In my opinion, that country should
have been left for grazing. From the tops of these hills you
can see very few residences. You will probably find only 10
or 12 families residing within 10 miles of this tract."

Anderson testified that the flat lands out from the hills had
improvements, and had market value; but that the lands in
question had no cash market value.

Heckel testified, concerning the upper tract, practically
the same as Donovan and Anderson. Speaking of "Lost Lake,"
on which the land borders, he said:

"The shores of the lake bordering this strip of land are
plainly marked with a deposit of alkali,—I should judge, a
strip 6 or 7 feet wide." He said, "In my opinion, the Lost
Lake tract has no market value."

The Scheffelbeins and Edwards testified with respect to
the lower tract of 160 acres, that they knew of its being home-
steaded by a man by the name of Nestor Ziovotsky. The home-
steader made no improvements. He proved up, and lived there
a short time, and moved off. Most of the original homesteaders
got a little land, and then left it. That was the end of it. They
could not make it, and had to go. They did not know of any
land that had been bought and sold during the last number of
years, in the vicinity of the land in question. There were no
improvements on the land in question. Edwards had a fence
around the land, and used it for pasture. Scheffelbein, Sr.,
said:

"The soil is not very good. The soil I would say is gravelly,
sandy, and clay. This sandy and gravelly soil dries out fast,
and it does not raise anything,—no grass or anything else. Some
of the land has 20 tons of rock to an acre, and on some acres
you find a lot more; in the hollows not so many; but in the
hills, pretty thick."

The witness further said that, if the land lay next to his,
he could use it, and would give something like $8 or $9 an acre
for it, but that, lying away from his land as it did, he would
not want it; that the only way the land had any value was to
somebody whose land adjoined this land.

Edwards testified that, in 1919 and 1920, he had the land rented from Peterson at $35 for the whole tract, and that he owned the fence around it; that the 160 acres consisted of potholes, hills, and valleys, and that it would not be practicable to farm it if the rocks were off.

Heckel testified concerning the middle tract and the lower tract substantially the same as the other witnesses: that, in his opinion, the land had no market value; that it might have a value of $5.00 or $6.00 an acre to someone owning land adjoining it, for the enlargement of their pasturage lands.

Peterson represented the location of the middle tract to be 6 miles from the town of Lignite. The evidence shows, without dispute, that it is over 11 miles distant from Lignite.

The value of the livery barn property owned by Mary Higgins was placed by disinterested witnesses at approximately $2,500. We have not attempted to set out all the evidence, but enough to show the salient features. After a careful consideration of the testimony, we conclude that the land is of little value; that it is not worth the incumbrance resting upon it. Peterson was acquainted with the character of the land, and made what amounted to positive representations as to the value of the lands, and as to the upper and middle tracts, that "the soil was good." The evidence establishes that the soil, or more accurately speaking, in this instance, the surface of the land, consists of sand and gravel; that some grass grows on it, which is described as mostly wire grass and thinly set, with some willows and longer grass in the coulees; that some of the lakes on the land are salt, and some are alkali; that the land has some value for grazing; but that the small tracts in question, separated from each other, have no considerable value, except to owners of larger tracts to which they join, for grazing purposes. We think that the charge of fraud in procurement of the contract was established.

To enforce specific performance in the instant case would not be equitable. The case comes within the general rule that courts of equity will not interfere to decree specific performance, except in cases where it would be strictly equitable to do so. 2 Story on Equity Jurisprudence (13th Ed.), Section 750.

2. SPECIFIC PERFORMANCE: contracts enforcible: inequitableness.

Appellant urges that, even if defendant's charge of false representations should be sustained, appellee Mary Higgins is not entitled to have her title quieted to the Decorah property against him, because of misjoinder of parties for that purpose. We think the court was correct in entering the decree quieting title. Mary Higgins was the owner of the Decorah property, and George W. Higgins became a necessary party only because he was husband of the owner.

We arrive at the conclusion that the decree of the lower court should be, and it is, affirmed.—*Affirmed.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.