MABEL C. BARR, Appellee, v. J. M. BUTLER, Appellant.

**FRAUD:** Representation of Value—Burden. A statement of *value* is actionable when made in a manner and under such circumstances as to constitute a representation of fact; *but he who so asserts must so plead and prove.*

*Appeal from Pottawattamie District Court.—*E. G. ALBERT, Judge.

DECEMBER 11, 1923.

REHEARING DENIED MARCH 14, 1924.

ACTION for damages for false representations in the sale of land. The defense was a general denial. There was a verdict for the plaintiff for $1,750. From the judgment entered thereon, the defendant has appealed.—*Reversed.*

*Kimball, Peterson, Smith & Peterson,* for appellant.

*Robertson & Robertson,* for appellee.

EVANS, J.—I. On June 21, 1918, the plaintiff by written

contract purchased from the defendant a farm of 70 acres in Pottawattamie County, at $150 per acre. The negotiations for the purchase were initiated by herself, and the first thereof were had with the witness Caster, who was a real estate broker and agent, and who was a friend and relative of the plaintiff's. The land had not been listed with Caster, nor had he at that time any agency for the sale thereof. She expressed to him a wish to purchase a small farm. Lands were moving in that county at that time at advancing prices, and she proposed to invest for the purpose of speculation. Caster suggested this farm as a possible investment. Pursuant to his conversation with her, he phoned to the defendant, asking whether he would sell, and at what price. The defendant answered in the affirmative, and named his price at $150 an acre. This was communicated to the plaintiff. She and Caster immediately went out to and upon the farm, and examined it. This was in the early evening of June 20, 1918. The false representations that are complained of were made, if at all, at that time by Caster. These representations, as later submitted to the jury, were two in number, as follows:

"1. The alleged representation that the farm in controversy at the time of the sale was of the value of $200 per acre.

"2. The alleged representation that said farm was in good condition for raising crops thereon."

Upon examination of the farm that evening, the plaintiff declared her purpose to buy it at the price named by the defendant. At 9 o'clock that night, Caster phoned again to the defendant, saying, in substance, that the plaintiff would buy his farm at the price named. He also requested the defendant to come to the home of plaintiff the following morning. This request was complied with by defendant, and he appeared at the plaintiff's home on the following morning, at which time the plaintiff drew the contract that was entered into. The contract then entered into was fully performed by both parties, and the plaintiff entered into possession of the farm in March, 1919. After the expiration of nearly three years, she claims to have discovered the falsity of the representations made to her, and she brought her suit accordingly.

It will be noted from the foregoing that the alleged repre-

sentations complained of are primarily mere matters of opinion, and as such are not actionable. We have held, however, that, though a statement of value by a seller be ordinarily only a matter of opinion, yet it *may* be made in a manner and under circumstances such as to constitute a representation of fact; and if knowingly false, then it is a false representation, and actionable as such. On the other hand, the rule that a seller may puff and commend the qualities of his property, and may fix his own price thereon, and may declare his own opinion of value thereof, without liability as for a guaranty or representation of fact, has never been abrogated. Where a purchaser bases his cause of action upon such declaration as being a representation of fact, the burden is upon him to produce evidence of such facts and circumstances as shall bring such declaration of value within the exception to the ordinary rule. It is not sufficient that the pleading characterize it as the statement of a *fact*, rather than of opinion; neither is it sufficient that a witness so characterize it, as a matter of opinion on his part.

The controlling question presented on this appeal is: Does the evidence in the record support the finding of the jury? Is there any evidence, circumstantial or otherwise, to show that the statements set forth took on any other character than that of such puffing and praise of value and quality as a seller is privileged to make? Except the statements themselves, is there any evidence of fraud or of intentional falsehood on the part of Caster in the making of them, to say nothing of his want of authority to make them on behalf of the defendant? We have read and reread every line of the evidence, and find nothing therein to support the finding made. Treating the evidence as sufficient to prove the making of the statements by Caster, the evidence of falsity is confined to the first statement as to value. The proof of such falsity consists wholly of opinion evidence of value by witnesses, of precisely the same character as the opinion statement itself.

The theory put forth in argument as giving a fraudulent aspect to the statement alleged is that the plaintiff was a woman and a widow; that she had no knowledge concerning real estate or values; that she was wholly inexperienced and trustful; that she had known the defendant all her life; that, at the time she

signed the contract, she advised the defendant that she was inexperienced and without knowledge, and that she relied upon his statements implicitly. This was a very advantageous position for the plaintiff to occupy, in that it enabled her to acquire the land without any labor of negotiation or bargaining, and to have the value fixed later by verdict of the jury. If the plaintiff intentionally put herself in that position, it was suggestive of astuteness, rather than of inexperience and ignorance. The theory thus put forth is not at all sustained by the evidence in the record. The plaintiff was not inexperienced and was not ignorant. On the contrary, the evidence shows that she was an intelligent business woman, of long experience in responsible positions. She was well acquainted in the county and in the vicinity of this land. She was born upon a farm not far distant. For six years, she was employed in a bank in the near-by town of Neola. For the last three years of such service, she was the assistant cashier, and performed the miscellaneous services called for by such a position in a country bank. The making and closing of real estate transactions was a frequent item of business in such bank. Before her services in the bank, she had been a school-teacher for three years. After her services therein, she took a course in a business college. Thereupon, she entered the service of a prominent real estate firm in the city of Council Bluffs, where she continued for seven years, and where she was engaged at the time the contract was entered into. She was posted in the prevailing stir then existing in the real estate market. Shortly before this purchase, she had entered this market, and purchased one farm. She accomplished a quick return thereon, having bought for $137 an acre and sold for $171. She conceded as a witness that she was purchasing the Butler farm as a speculation. She did so with full knowledge of the general conditions in the real estate market at the time. It cannot be said, therefore, that this was a case of dealing with an illiterate or ignorant or inexperienced person. There is nothing in the circumstances disclosed which would justify court or jury in so finding.

The plaintiff produced witnesses who testified to the market value of the land in June, 1918, at $50, at $60, and at $75. This opinion evidence was largely predicated upon the hypothesis

that the falsity of the second representation was proved. But there was no evidence of such falsity. The cross-examination of these witnesses discloses the mental reservations under which their opinions were given.

For the purpose of proving her reliance upon the first representation set forth, the plaintiff herself testified to her inexperience and her want of knowledge of real estate values. For the purpose of proving the falsity of such representation, she testified also to her knowledge of the value of the said farm in June, 1918, and that it was worth $60 an acre. The net result of the record is that there was sufficient evidence to go to the jury to the effect that the farm was worth less than $200 an acre, and sufficient evidence, perhaps, to go to the jury that Caster said it was worth $200 an acre. Under the rule of measure of damages obtaining in such cases, the measure of recovery would be the difference between what the land was actually worth and what it would have been worth if as represented. Such was the rule given by the trial court in the instructions. The jury could not have found for the plaintiff without finding that Caster represented the farm, as a matter of fact, and not of opinion, to be worth $200 per acre. From such finding, it would necessarily follow that the land would have been worth $200 per acre if Caster's representation had been true in fact. The measure of recovery, therefore, would be the difference between $200 an acre and the actual value of the farm. The jury fixed such difference at $1,750, which would be $25 an acre. The jury must, therefore, have found the actual value of the land to be $175 per acre. If this was not the basis of the verdict, then the jury must either have disregarded the representation of Caster or must have disregarded the instructions of the court. If the jury disregarded the representations of Caster, then it disregarded the only allegation of fraud upon which the action was predicated, and could not properly render any verdict for the plaintiff.

Explaining the verdict, therefore, upon the only basis consistent with the petition and with the instructions of the court, the jury must have fixed the value of the farm in its actual condition at $175 per acre. The necessary effect of such finding of fact was the further finding that the farm must have been in

good condition for raising crops, in order to have such actual value. Without further discussing the evidence at this point, we will proceed to set out in the next division hereof sufficient of the evidence adduced by the plaintiff on the trial to fully indicate its general character and its deficiencies.

II.   McManus testified:

"The soil on this 70 acres is like most of that district, and is what is known as humus on top—sometimes that is mostly down off the hills, in the low places.   There are two hills running through the piece of land, and the soil,—that is, the humus, as we call it,—is pretty well taken off of the hills, and moves down onto the low land.   There are two large hills on this 70-acre tract, and I would figure there was about 10 acres of bottom land. More than one half of the land of what I have described is in the hills, and in these hills, the clay subsoil is apparently on top. It is what is called Missouri drift, or black humus on top, and clay subsoil.   The 70 acres was fairly worth on the market, on June 21, 1918, $60 to $65 per acre."

"Cross-examination.

"Prices were advancing very fast, early in 1918.   I am not basing the value of this land on the price, but what I call the value.   The price is what it would have sold for.   I do not pretend to say what the value of the land was at that time.   I am not putting any value on it in the spring of 1919.   I had it listed with me in February, 1920, for $200 per acre,—plaintiff would have taken a little less.   I know that loess is a form of clay.   I can't give the distinction between clay and loess.   I didn't see this land with any idea of determining its quality and price until 1920.   I did not determine its price on the market then.   I do not know what it was worth then.   It may have been worth a great deal more than what I put the value in 1918."

"Redirect Examination.

"That clay produces good crops.   It would produce good alfalfa and fairly good corn.   You don't have to fertilize it at all, to raise alfalfa."

"Re-cross-examination.

"I have a farm there in Hazel Dell Township, just below this, for sale.   It has a big ditch of about five acres on it.   The

hills are higher than on this place. I am asking $200 per acre for that, and I am going to get it.''

The same witness, recalled, testified:

''Q. What would have been the fair and reasonable market value of this 70 acres of land if it had been in good condition for raising crops at that time and place? A. From $150 to $200 per acre.''

''Cross-examination.

, ''If this land had had alfalfa on it and clover on it and the crops had been regularly rotated, it would, in 1918, have been worth $200 per acre, if it had been well cared for. I do not know how the crops were rotated. I do not know how much alfalfa there is on it. I do not know how much is seeded down to pasture, nor how much clover there was on it. Q. Now suppose one third of it was seeded down in pasture, and there was some five to ten acres of clover on it, that the balance of it was in alfalfa, you would say that was in pretty good farming shape, wouldn't you? A. If it had been, I would say so. Q. You do not know that it had not been, in 1918? A. No, sir. I suggested to counsel at the table, after my examination yesterday, that, if a buyer could have been found for it, this land was still worth $150 per acre. Q. What did you mean by the statement that you say you made to Mr. Kimball? A. I meant that the · farm has always had an exchange value of $150 or $200 per acre. Q. By exchange value, do you mean trading value? A. Exchange for other property.''

''Re-cross-examination.

''I think I said it had an exchange value of $150 an acre, and always had, and does now. Q. You didn't say anything about trading for other property? A. No, but that is what I mean by exchange value. Q. Do you know of any land in that vicinity that sold for cash for anything less than $150 per acre? A. No, sir.''

The witness Martin testified:

''I know what that 70 acres was fairly and reasonably worth on the market, where it is located, at Council Bluffs, June 21, 1918. Q. What was that 70 acres fairly and reasonably worth on the market at that time and place? A. Why, about $75, I

should judge,—long about that. Q. You may tell the jury whether you know of any land that is like the 70 acres in that vicinity? A. No, I do not know as there is any just like this, that I know of. That is what I mean, like that,—that has been rented out for 15 or 20 years, and maybe two people have rented it in 20 years, and rented it and never put anything on it, and took everything off. The soil could have been built up by seeding it down; but renters don't do that. They always take everything off, and put nothing on.''

''Cross-examination.

''I don't know of any land in that vicinity that sold for $75 per acre in 1918. I don't know how much alfalfa there was on this place in 1918. I don't know how much of this was seeded in 1918. I never had any occasion to ask or find out. I don't know of any land in that vicinity that was sold anywhere as cheap as $75 per acre in 1918. I am assuming and fixing the value of it *that none of the ground was seeded down in 1918.* I don't know, as a matter of fact, whether the land went more bushels to the acre than other land around there, in the fall of 1918.''

The same witness, recalled, testified:

''Q. What would have been the fair and reasonable market value of that 70 acres of land on June 21, 1918, if the land had been in good condition for raising crops? A. Well, in a high state of cultivation, it would have been worth $200 per acre.''

''Cross-examination.

''I testified, the land in the condition in which it was in 1918 was worth $75 or $100 per acre. Q. Did you see this land in 1918? A. I passed it. I didn't walk over it. I did not see how much of it was seeded down. I do not know how much clover there was on it. I do not know how much alfalfa there was on it. I do not know any of those things, or how much crops had been raised on it. I saw it was all in cultivation. I think that the rotation of the crops would make $130 difference in the value of the land, if in a high state of cultivation.''

Wohlers testified:

''I own 233 acres straight east of this land. I know what this 70 acres of land in dispute was fairly and reasonably worth on the market on the 21st day of June, 1918, where it is located,

at Council Bluffs, Iowa. Q. What would you say this 70 acres of land that is in controversy was fairly worth on the market, at that time and place, in your judgment? A. All the way from $75 to $80."

"Cross-examination.

"I didn't see any land up there sold for that. It is mixed creek bottom and hilly land. Q. Do you know how much corn that place raised to the acre in 1918? A. I don't know. I guess it raised as much as any, in 1918. I don't know how much alfalfa it raised. It is all under plow. Farms in that vicinity have sold for $100; some for $115; and one for $240 per acre. That right across the road from this, and cornering with it, sold for $240 an acre. It is the McBride place. The corner of this land is right on the edge of Honey Creek. A little corner of it is taken by the creek. The McBride land comes down to the creek just the same on the other side of the creek, and runs back up the hill. The hills on the McBride land are considerably higher than on this land. The land runs further up just like the Johnson land, while this 70 acres only runs part way up the hill."

The witness Tamisea first testified that the farm was worth $75 per acre. Upon further interrogation, he reduced his estimate to $50.

"Cross-examination.

"Q. You say you do not know what the value of this land is? A. No, I don't. I was judging the price by what it had been priced at before that time. The land around it has advanced. The land advances in price, after you get over the fence. Q. Now, why did you say this land was worth on the market, in June, 1918, $75 per acre, and then, when Mr. Robertson was not satisfied with that, why did you change it to $50? A. That was the price, but not the value; that was not the value. Q. How did you fix the price? A. By what it has been supposed to be selling at, and what they have been asking for it. I heard of that one piece of land selling for $150 per acre. Q. What other piece of land had been selling in there? A. One sold for $210 per acre, a mile from it. It was in the hills and near the river. The hills get steeper as you go towards

the river.   The McBride land sold in 1920 for $240 per acre. That land is probably 15 rods from the corner of the 70 acres.''

''Redirect Examination.

''I distinguish this 70 acres from the other land in that neighborhood by the crops it raises.''

''Re-cross-examination.

''I do not know how much of a crop this land raised in 1918. I do not know how many bushels it went to the acre in corn, nor how many tons of alfalfa it raised.''

The foregoing constitutes the evidence of the principal witnesses on the question of value, and is fairly representative of all.

On the question of representation, the plaintiff herself testified to the conversation had with Caster while she was examining the farm, as follows:

''A.   He said it was easily worth $200 per acre, and that he could sell it again for that.''

''A.   He told me it was a good farm.   Was raising good crops.''

Concerning the conversation in the presence of Butler at the time the contract was signed, she testified:

''Q.   What did Mr. Butler say that day, now, that the land was worth to you—that land?   A.   He said it was worth more money than $150.   Mr. Butler didn't say it was worth any stated amount, but said he could make money on it by buying it at $150.   Q.   What did Lou Caster say that morning, in the defendant's presence, about this land being worth $200, and that he could sell it for you?   A.   He said he could sell it again for me at $200.   Lou Caster made the statement in the morning, in the presence of the defendant, that I could make money by buying it at $150.   Mr. Butler didn't make any denial of this, and said himself that I could make money.   Mr. Caster didn't say what it was rented for, in the presence of the defendant.''

III.   From the testimony set forth in the foregoing division, it will be noted that the witnesses predicated their estimate of value upon the hypothesis of fact that there had been no proper rotation of crops upon the farm, and no seeding of the same to the clovers.   There is no evidence in the record that the

farm had been neglected in these respects. All the evidence on the subject is affirmatively to the contrary. It appears without dispute that the defendant seeded clover with every seeding of small grain; that there was an alfalfa field upon the farm; that there was a clover field at the "north end;" that there was a sweet clover pasture; and that white clover also was sowed therein. Every acre of the farm was growing a crop either of clover, alfalfa, or grain. There was a fine stand of corn growing thereon on June 20, 1918, when the plaintiff visited the place. She saw the growing crops, the clover field, and alfalfa. It is true that one of the witnesses for the plaintiff testified that, because of weather conditions, the corn crop in that locality proved to be a failure in 1918. But he also testified that the corn crop upon this farm was as good as any that year. The hilly character of this farm was characteristic of all farms in that region; nor is it claimed that this land was more hilly than the near-by farms. Its condition in that respect, whether comparative or absolute, was readily observable to the plaintiff when she visited the place. The very conditions of rotation and seeding of alfalfa and clover which appear without any dispute in the record would, under the testimony of plaintiff's witnesses quoted in the foregoing division, have made this farm worth $200 an acre. Granted that this estimate of the witnesses was probably exaggerated, and perhaps made with a view of protecting the plaintiff in her measure of damages, yet it emphasizes the incongruity of plaintiff's position and the utter inconsistency of the testimony of her witnesses, which could fix an actual value of $60 or $75 an acre, and yet claim a value of $200 an acre for the same land if properly farmed and rotated with fertilizing crops, the latter condition being nowhere negatived by the plaintiff.

We do not overlook two other specifications of fraud pleaded in the petition, which the court withdrew from the jury. One was that Caster represented the farm as being then rented at $7.00 per acre; the other, that Butler represented that he had an offer of $135 an acre for the farm. Though both of these alleged representations were denied by Caster and by Butler, plaintiff's evidence would have been sufficient to take the issue on them to the jury, if they had been material. According to plaintiff's testimony, Caster said that the land was rented for

$7.00 an acre, and that the plaintiff could rent the same for $10 or $12 an acre. . The plaintiff did rent the same the first year at $10 an acre, and thereafter at $12 an acre.

As to the alleged offer of $135 an acre, the representation testified to implied on its face that this was the largest offer that the farm had ever commanded. The clear effect of this statement would be to detract from the $200 valuation upon which plaintiff was relying, rather than to aid it.

Taking the case by its four corners, it is one where the vendor of land named a price for it, and averred, in effect, that it was worth more than that price, and that it was cheap at such price. It was his legal privilege to so contend. Farm land is not a liquid asset. Land sales are not made upon market quotations. The actual market value of farm land is to some degree a matter of approximation. In a given case of sale, the selling price is not.made by any fixed rule. It is made by negotiations between purchaser and seller. The seller may name his own price and contend for it. The purchaser may state his own offer and contend for that. The seller usually thinks that he is selling too cheap; and the purchaser fears that he is paying too much. Naturally, if not necessarily, the. subject-matter appears to the seller to be of greater value than it does to the buyer, because each sees it from a different point of view. That a seller should contend that his price is less than the fair value has in it no quality of fraud. Without the privilege of such assertion, negotiations between purchaser and seller would become dangerous and impracticable. In the case before us, the negotiations were brief. They were initiated by the plaintiff under the spur of advancing values. Upon request, the defendant named his price, and said it was cheap. It is not readily conceivable that less could be said in the negotiations of a sale than was said by the defendant in this case. Though plaintiff's witnesses now testify, in the light of subsequent events, that the farm was worth only a fraction of the selling price in June, 1918, it is manifest from their testimony as a whole that none of them would have so testified in June, 1918. To sustain the verdict in this case, we must say that the mere assertion by a seller of what he claims to be the value of his land is of itself sufficient to warrant a finding by a jury that such assertion was a representation of fact, within the

knowledge of the defendant, and that it was knowingly false, if witnesses be produced who, in their opinion, fix the value at a lesser sum. It should not be sustained at such a price. The gist of the action is fraud. It was incumbent upon the plaintiff to produce some evidence, direct or circumstantial, to impeach the good faith of the defendant in the exercise of his otherwise legal privilege. That he exercised such privilege is in itself no evidence of fraud. Such only is the sum total of the evidence.

The plaintiff relies upon that pronouncement found in a number of our cases, that representations of value and of quality *may* be a representation of fact, if made with intent to deceive. Special reliance is placed upon the following of our cases: *Rembe v. Ferguson,* 183 Iowa 29; *Murray Bros. & Ward Land Co. v. Keesey,* 183 Iowa 739; *Lister v. LaPlant,* 183 Iowa 1363; *Peterson v Higgins,* 194 Iowa 759; *Dilenbeck v. Davis,* 186 Iowa 30; *Deetkin v. Scholes,* 193 Iowa 551.

Examination of these cases will disclose that in none of them was the assertion of value or quality the sole representation relied upon. In each case, other facts and circumstances were made to appear, which gave the color of fraud to the transaction and disclosed the intent to deceive. Where intent to deceive is made to appear, it matters little by what details the deception is accomplished. In most of our cases where land values have been represented, the representation has usually related to lands in other states or distant parts, where the injured party has no acquaintance or ready convenience to form for himself, at the time, an intelligent judgment. Sometimes the injured party has been an illiterate person; sometimes confidential relations have been abused. Both of these elements were present in the *Rembe* case, supra. Not only was the injured party an illiterate person, not able to read or write, but his banker, upon whom, in his own disability, he relied implicitly, was employed by the other party to aid in the transaction. The land involved was located in Minnesota. The injured party had no knowledge of land values there. The other party took him up there to see the land, and took the banker along. By a system of close attention, the injured party was not permitted, while in Minnesota, to see any disinterested person, for the purpose of inquiry for himself. Other lands near by were exhibited to him, and false

representations of sales were made thereon. The resulting trade was one of gross inadequacy to the injured party. The case as a whole is fairly illustrative of the pertinency of the pronouncement relied on by appellee herein.

Most of our cases involving representations of land values have been cases in equity, for specific performance or for rescission. *Scienter* has not, therefore, been a necessary element in such cases, as it is in an action at law for damages. Such were the first four cases above cited.

The *Dilenbeck* case, supra, was one where the purchaser had bought bank stock upon representations of value. In that case, the actual value of the stock was determinable from the books and assets of the bank. The question of value was only in a very small degree a matter of opinion.

In *Deetkin v. Scholes,* supra, the injured party purchased a stock of goods upon representations that amounted to a false invoice. Several material concealments were made. Boxes supposed to be filled with new merchandise were, in fact, empty. The price obtained from the injured party was unconscionable. The amount thereof was $4,500. The defendant's own evidence showed that the stock was worth not to exceed $2,500. His only recourse to cover the discrepancy was to claim that his leasehold interest and good will were worth the difference.

Clearly, there is nothing in our holding in the case at bar inconsistent with the cases thus relied on by the plaintiff.

For the purpose of this appeal, we ignore the question of the authority of Caster to make the representations alleged, and to bind the defendant thereby. There is no occasion that we make any pronouncement thereon. We hold that the verdict was contrary to the evidence and contrary to the instructions of the court.

It necessarily follows that the trial court should have sustained the defendant's motion for a directed verdict, at the close of the evidence. The judgment below is, accordingly, reversed. —*Reversed and remanded.*

PRESTON, C. J., ARTHUR and FAVILLE, JJ., concur.