A. C. ECKSTEIN, Appellee, v. D. B. STORCK, Appellant.

**TRIAL:** Instructions—Right of Purchaser to Rely on Representations.
1  The jury must not be told that a plaintiff in an action for false representations had a *right to rely* upon the representations alleged, when that right is the very gist of the litigation.

**FRAUD:** Waiver—Execution of Contract After Discovering Fraud. A
2  party to a fraud-induced contract who discovers the fraud *in time to save himself* from all damages,—i. e., before either party has conveyed his property to the other,—may not proceed, and execute the contract, and then claim and recover damages because of the fraud.

**FRAUD:** Statements as to Value—When Actionable. A false representation of the *value* of property, made during a sale thereof, is not,
3  in and of itself, actionable, unless the party carries his proof further and by facts and circumstances shows that the representation as to value was intended to be taken and acted on as a statement of *fact.* Such facts and circumstances might, *inter alia,* consist of a showing (1) that the land was so situated as to render examination impossible or impracticable; (2) that examination was cunningly prevented; or (3) that the parties occupied a fiduciary relation.

**FRAUD:** False Representations as to Soil Conditions—When Actionable.
4  Representations to the effect that there was "very little sand" on a farm, and that only in a "few small spots," and that the soil was "good, fertile soil," are not actionable unless shown to be false and made with intent to deceive—not actionable if the proof goes no further than to reveal a permissible praise of a party's property.

**FRAUD:** Unconscionable Contract—Evidence. Evidence reviewed, in a
5  case where parties exchanged inflated property valuations, and held wholly insufficient to justify a finding that the contract was unconscionable on the part of the defendant.

Headnote 1:   38 Cyc. p. 1651 (Anno.)   Headnote 2:   27 C. J. p. 24.
Headnote 3:   26 C. J. pp. 1216, 1218, 1219, 1220; 27 C. J. p. 68.   Head-
note 4:   27 C. J. pp. 68, 70.   Headnote 5:   27 C. J. p. 68.

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

MAY 15, 1925.

ACTION at law for damages for false representations in the
sale of a farm. The answer was a general denial. There was a
jury verdict for the plaintiff for $12,000, and judgment entered
thereon. The defendant has appealed.—*Reversed and remanded.*

*Charles J. Haas,* for appellant.

*Barnes, Chamberlain, Hanzlik & Thompson* and *Park Cham-
berlain,* for appellee.

EVANS, J.—A written contract was entered into between
the parties on February 6, 1920, whereby the defendant agreed
to convey to the plaintiff his certain farm of 120 acres, and
whereby the plaintiff agreed to transfer to the defendant, in par-
tial payment therefor, his store building and his miscellaneous
stock of goods therein, then situated in the village of Alburnett,
in Linn County, Iowa. The parties to the contract were both
residents of Linn County, but were strangers to each other
prior to the transaction under review. The plaintiff was an ex-
perienced farmer. In 1918, he exchanged his farm for the store
in the village of Alburnett. His acquisition included both the
building and the stock of goods therein. He operated such store
up to the time of the transaction here in question. The farm
was put into the trade at $260 per acre, amounting to a total
of about $31,000. The plaintiff's store building was put in at
$6,000, and his stock of goods invoiced more than $15,000; and
these amounts were applied as credits upon the purchase price
of the farm. The contract was by its terms executory, and was
to be performed on March 1st. It was later modified, and was
not wholly performed until March 30th. The plaintiff moved
on the farm in the last days of February. Two years later, he
brought this action. The representations charged were:

"(1) That there was very little sand on this farm, and that only in a few small spots, and that the soil was good, fertile soil; and (2) that it was of the reasonable value of two hundred sixty ($260.00) dollars per acre."

The falsity of such representations was charged as follows:

"That, as a matter of fact, the farm of the defendant above described, which was exchanged, transferred, and conveyed to this plaintiff, was not of the reasonable value of two hundred sixty dollars ($260.00) per acre, and was not worth to exceed one hundred thirty dollars ($130.00) per acre. That the said farm is a very sandy piece of ground, and not fertile soil. That a large part of said farm is sandy land,—in fact, so sandy that it is impossible to raise reasonable crops thereon; all of which facts were well known to the defendant at the time of making the representations aforesaid to this plaintiff."

Such were the tendered issues upon which the case was tried. The plaintiff testified as follows:

"* * * and I asked what kind of a farm,—if rolling ground,—and he said, 'level black soil;' that there was only a few rocks in the pasture, and only a few sandy spots around the buildings. This was the first conversation I had with him. Then I asked him what the price was, and he said he had to have $265, and I says, 'That is an awful price for a farm.' 'Well,' he says, 'that is a very productive farm, and it is a nice farm;' * * * and he went on to tell me it was a really good farm, and well worth the money."

The foregoing comprises all the testimony of the plaintiff as to the representations made. The negotiations preceding the contract were had at the plaintiff's store at Alburnett. On that day, the plaintiff was sick, and was personally unable to go to the farm, which was about 14 miles distant. He therefore delegated Quaas, a friend of his, and an experienced farmer, to go and see the farm for him, in company with plaintiff's wife. These two went with the defendant to the farm. The attention of plaintiff's wife was directed mostly to the buildings and to the inside of the house; whereas Quaas gave his attention to the farm at large. The ground was largely covered with snow on that day, and Quaas was not able to make a careful examination of the soil, although he carried a shovel for that purpose. He

directed his attention to the cornstalks he found upon the place, and especially to the size thereof, and to the quality of the corn which he found in the cribs upon the place. Some days later, and about the middle of February, the plaintiff himself went upon the place, with the defendant. A few days later, he went again upon the farm, with his own brother. He testified that he did not on this occasion make an examination of the farm, although it is not denied that he had opportunity to do so. He finally moved upon the farm, two days before the first of March. The plaintiff never complained, at any time prior to the beginning of this suit, that he had been deceived or wronged in any respect, although he and the defendant frequently met, in the ensuing two years. The case was tried upon the theory indicated in the petition: that what the defendant said during the negotiations as to the price and value of the farm, and in praise of the quality thereof, was all intended by him as a representation of fact, and was so relied upon by the plaintiff. Evidence was introduced on behalf of the plaintiff that the soil had *much* sand, rather than *little,* and that plaintiff's farming thereof had not been a success. Evidence was also introduced in his behalf in support of his allegation that the value of the farm was only $130 per acre, and not $260.

The errors assigned by appellant go to the question whether either of the representations charged by plaintiff was actionable; and whether the evidence as a whole was sufficient to sustain the verdict of the jury. With this objective, specific complaint is directed against some of the instructions. One or two of these specific complaints will be first considered, as introductory to the consideration of the larger merits of the appeal.

I.   Referring first to Instruction 12,—the opening sentence thereof was as follows:

"Plaintiff had a right to rely upon the alleged representations of the defendant about the quality and value of the land in question, instead of going and making an examination or an investigation thereof."

This sentence presents a very sweeping proposition. It carries in its arms plaintiff's whole case. Under the evidence, the very gist of the litigation was whether the representations made

1. TRIAL: instructions: right of purchaser to rely on representations.

by the defendant were such as gave the plaintiff a right to rely thereon as representations of a fact, rather than of an opinion. Upon no view of this evidence could the plaintiff be entitled to more than a submission of the question to the jury. In *Bean v. Bickley*, 187 Iowa 689, 706, we said:

"The buyer cannot recover if means of knowledge were as open to him as to the vendor,—if the buyer fails to avail himself of means readily accessible, the use of which would have saved him. *Lawson v. Vernon*, 38 Wash. 422 (80 Pac. 559, at 563). There are cases which hold nonreliance is shown, as matter of law. On the other hand, we held, in *Shuttlefield v. Neil*, 163 Iowa 470, and in *Peterson v. McManus*, 187 Iowa 522, that there, reliance and right to rely were for the jury."

We see no occasion for further elaboration on this question.

II. Instruction 14 was as follows:

"If you find from the evidence that the plaintiff was induced to make the contract, Exhibit 1, with defendant on account of the representations made by him, and that said representations, or some of them, were false, and that plaintiff relied thereon, and, believing them to be true, was deceived thereby, then the mere fact that plaintiff discovered that said representations were false prior to the complete performance of said contract on his part would not defeat his recovery in this action; but he could elect to either rescind the contract or affirm and complete the same and bring suit, as he has in this case, to recover his damages; and his conduct in completing the contract and his failure to complain of the said fraud, if you so find, was not a waiver of his damages, or any part of them."

2. FRAUD: waiver: execution of contract after discovering fraud.

Complaint is made of such instruction. The instruction was erroneous. If plaintiff discovered the fraud in time to save himself by refusal of performance, he is not deemed to have suffered damage in advance of such performance. This question also was before us in *Bean v. Bickley*, above (187 Iowa 709, 710), and an excerpt from the opinion in that case will be a sufficient discussion in this:

"When one buys with knowledge that the property has certain defects, he cannot recover for a representation that it was

free from that defect. Any loss sustained is, in a sense, self-inflicted, and therefore is not traceable to the representation. This rule is applied where a false representation obtains a contract, the fraud is discovered while such contract is wholly executory, and the defrauded party then elects to carry out the contract; and appellant urges that rule in his behalf. The many cases which affirm this rule rest on the self-evident proposition that, where one discovers the fraud when he is still wholly at liberty to save himself from its effects, what he thereafter does to his own injury is self-inflicted, and that one may not recover damages which result from his own acts, instead of the act of the defendant. See *Kingman & Co. v. Stoddard,* 85 Fed. 740; *People v. Stephens,* 71 N. Y. 527; *Simon v. Goodyear Met. R. Shoe Co.,* 105 Fed. 573; *Richardson v. Lowe,* 149 Fed. 625. And this rule holds, even if there has been partial execution. If the defrauded party is able to stop further performance in safety, at least what he does after discovery is self-inflicted. In that class is *Ponder v. Altura Farms Co.,* 57 Colo. 519 (143 Pac. 570); *Nounnan v. Sutter C. L. Co.,* 81 Cal. 1 (22 Pac. 515); and *Vernol v. Vernol,* 63 N. Y. 45. One may not, with knowledge of all the facts, persist in what he may safely refrain from doing without loss, and speculate with a view to enhancing the loss, if the speculation prove disastrous, and then trace the injury to the claimant. Such injury is not traceable to him. *Ponder v. Altura Farms Co.,* 57 Colo. 519 (143 Pac. 570, at 572); *Gilmer v. Ware,* 19 Ala. 252, at 259; *Thompson v. Libby,* 36 Minn. 287 (31 N. W. 52); *St. John v. Hendrickson,* 81 Ind. 350; *Kingman & Co. v. Stoddard,* 85 Fed. 740; Kerr on Fraud & Mistake (1st Ed.) 299. And it was held in *Haven v. Neal,* 43 Minn. 315 (45 N. W. 612), and *Sell v. Mississippi R. Log. Co.,* 88 Wis. 581 (60 N. W. 1065), that, in special circumstances, the continuance of work and expenditure after the discovery of a fraud will make intent to waive damages a jury question.''

See, also, *Hagen v. Barry,* 194 Iowa 1207, 1211.

In the case at bar, the plaintiff entered upon the occupancy of the farm before he had received a deed therefor, and before he had excuted a deed of his property to the defendant. Though the contract called for a mutual performance on March 1st, neither party performed on such date. On March 30th, they en-

tered into a supplemental written agreement, which modified the original contract. On the same day, they mutually executed and delivered to each other their respective deeds. At this time, the plaintiff had been in the actual occupancy of the farm for 32 days. There is no evidence that during this period there was any obstacle to the observation and discovery of the character of the farm. That its actual condition was readily observable is indicated by the testimony of plaintiff's witnesses, who were called to testify to its value. Some of these based their knowledge of its condition upon merely casual observation had 25 years previous.

The peremptory character of the instruction under consideration was, therefore, clearly erroneous and prejudicial.

III. The petition could be construed as charging a plurality of false representations. The trial court in its instructions so construed it. The instructions permitted recovery to 3. FRAUD: statements as to value: when actionable. plaintiff if he had proved the falsity of such "representations *or some of them.*" One of the representations so charged by plaintiff was that the defendant had represented the value of the farm to be $260 per acre. The other representation related to the character of the soil, and will be regarded, for the purpose of this discussion, as a single representation. Under these instructions, the plaintiff was permitted to recover if he proved that the representation of value was false, even though he failed to prove that the representation as to the character of the soil was false. The instructions in this respect can be sustained only on the theory that the alleged false representation as to value was, in and of itself, actionable, even though no false representation had been made as to the character of the soil.

We are confronted, therefore, with the question whether, upon this record, the alleged representation was actionable, as a representation of fact, or whether it was a legitimate expression of opinion by a vendor, puffing and praising his own property.

The primary rule is, concededly, that a declaration of value by a vendor in negotiations for a sale is to be regarded as the expression of an opinion, and that a vendor's puffing and praising of his property are to be regarded in like manner. *Bosley*

*v. Monahan,* 137 Iowa 650; *Bossingham v. Syck,* 118 Iowa 192; *Lucas v. Crippen,* 76 Iowa 507.

But this rule is subject to the exception that, if it appears from the circumstances surrounding the parties that the opinion expressed was fraudulently intended by the vendor as a representation of fact, to be relied on by the vendee, then it will become actionable, like any other false representation of fact. The burden in such a case is upon the vendee, to show facts and circumstances other than the representation itself, which lift the representation out of the privileged field of opinion. Unless such facts and circumstances are made to appear, then the representation must, as a matter of law, be deemed a mere opinion, and privileged as such.

One of our earlier cases wherein we sustained a finding that a declaration of value by a vendor of land was intended by him as a representation of fact, to be relied on by his vendee, was *Hetland v. Bilstad,* 140 Iowa 411. In that case we said:

"Parties in negotiating deals have the right to exalt the value or quality of their own property to the highest point credulity will bear, provided their efforts in this line go no further than puffing or praise which the vendor may properly indulge in; but statements of value or of quality may be made with the purpose of having them accepted as of fact, and, if this is done and so relied on, they are to be treated as the parties designed they should be,—namely, representations of fact. *Mattauch v. Walsh,* 136 Iowa 225. In that case the court said: 'The evidence in behalf of plaintiff clearly indicated the intention of Walsh that his assertion of the value of the land should be acted upon as true, and not merely as his estimate; and if so, and it was knowingly false and induced an exchange by plaintiff to her damage, it was actionable.' "

In the same case we quoted the rule from 2 Cooley on Torts (3d Ed.) 922, as follows:

"If the land is *at a distance* so that examination is impossible or impracticable, or if any deception or artifice is used to prevent examination or throw the purchaser off his guard, then false representation as to value may be actionable."

We also quoted the rule as elaborated in *Horton v. Lee,* 106 Wis. 439, as follows:

"The rule as to representations of value applies strictly only where the parties are dealing at arm's length and on equal terms. It does not apply where the relations between them are of a fiduciary character or of trust and confidence, or the person to whom the representations are made is incompetent to do business, or knows personally nothing about the subject of the sale, and is purposely induced, by the conduct of the vendor, not to inform himself, but to act under the advice of such vendor and the influences by him used to that end. While there is some conflict, by the great weight of authority the law is, as laid down by the text-writers and the courts, that, if property offered for sale or exchange be *in a distant locality,* and the vendee, to the vendor's knowledge, has no personal information in regard to it, and the latter misrepresents its value or quality, for the purpose of inducing a trade, and by artifice prevents the former from seeking information elsewhere or by a personal examination of the property, such misrepresentations are not mere expressions of opinion, but misrepresentations in regard to a material fact, satisfying the calls of actionable fraud in that regard."

The same question came under our consideration in the very recent case of *Barr v. Butler,* 197 Iowa 575. In that case we said:

"To sustain the verdict in this case, we must say that the mere assertion by a seller of what he claims to be the value of his land is of itself sufficient to warrant a finding by a jury that such assertion was a representation of fact, within the knowledge of the defendant, and that it was knowingly false, if witnesses be produced who, in their opinion, fix the value at a lesser sum. It should not be sustained at such a price. The gist of the action is fraud. It was incumbent upon the plaintiff to produce some evidence, direct or circumstantial, to impeach the good faith of the defendant in the exercise of his otherwise legal privilege. That he exercised such privilege is in itself no evidence of fraud. Such only is the sum total of the evidence."

See, also, *Hinman v. Treinen,* 196 Iowa 701.

In the light of our foregoing holdings, it must be held, upon this record, that the vendor's declaration of value was not shown to be actionable as a fraudulent representation of fact. This

holding is, of course, predicated upon this record; and the particular reasons therefor will be briefly stated. The record discloses no fact or circumstance which has hitherto been regarded as tending to show any other intent than the exercise of the vendor's privilege of opinion and of barter, except the opinion itself and the alleged false representations. We ignore, for the moment, the alleged falsity of the representation of the character of the soil. We do this because, under the instructions, the plaintiff was permitted to recover on the representation of value alone, even though there had been no false representation as to the character of the soil.

In our previous cases cited by the appellee in support of the judgment, all of such as involved land value related to land in distant parts from the place of contract. Some of them involved a relation of trust and confidence; others disclosed artifice on the part of the vendor, to prevent the vendee from making examination and discovery. Such is the general character of the attendant circumstances which have been heretofore relied on as tending to convert an expression of opinion as to value into an intended representation of fact. Nothing of that kind appears in this record. The parties were strangers, and dealt at arm's length. The plaintiff was an experienced farmer and business man. He was in the market for a trade of his store and stock. The character of that stock of goods will be referred to later. The proposed exchange was solicited by plaintiff through his agent, Fleming. The farm was located in the home county of the parties. It had been occupied and cultivated for more than 40 years, though the defendant himself had never occupied it. He became its owner by purchase in June preceding. There is no evidence of any artifice resorted to by defendant to prevent examination or discovery by the plaintiff. On the contrary, his opportunity was open and abundant, and was exercised by him for a period of more than six weeks before he accepted a conveyance from the defendant. There is no evidence or claim that the plaintiff was not as well acquainted as the defendant, with general farm values in Linn County. His claim is that he was ignorant of the value of this particular farm, because ignorant of its soil conditions. The question of the sufficiency of the evidence to sustain his claim of *reliance*, and to sustain his *right*

*to rely,* will be considered later. We hold at this point only that the evidence was not sufficient to sustain the alleged representation of value as an independent ground of recovery of damages therefor.

In so far, therefore, as the instructions permitted recovery thereon as an independent ground, they were erroneous.

IV. It remains to consider whether the representations as to the soil were intended as representations of fact, and were knowingly false. Was the evidence sufficient to sustain an af-

4. FRAUD: false representations as to soil conditions: when actionable.

firmative finding on that question? If the plaintiff made a prima-facie case of actionable false representations as to the condition of the soil, then doubtless the value fixed by the defendant upon his land would become admissible in evidence, as corroborative only of the evidence of other false representations. At this point in the discussion, therefore, we take account of all the evidence of alleged false representations, whether of value or of soil condition. Much of what we have said in the foregoing division as to the right of a vendor to puff and to praise, is applicable to this feature of the case. No mere difference of opinion between the defendant and the plaintiff's witnesses as to the quality of this soil will avail the plaintiff, unless it can be said that there is sufficient evidence in the record to justify the jury in finding that the defendant knew the falsity of his statements, and intended to deceive the plaintiff. We have already set forth plaintiff's evidence as to the false representations complained of. The evidence on behalf of plaintiff to show the falsity of the representations was, in substance, that from 40 to 60 acres of the land were very sandy, and that from 15 to 18 acres of it were slough, and as such, were untillable. Upon this predicate, the plaintiff's witnesses fixed the actual value of the farm, as they claimed it to be. Their estimates ranged from $110 to $125 per acre. In fixing the valuation, considerable emphasis was put upon the untillable character of the slough land. On the other hand, defendant testified, without contradiction, that he had told the plaintiff about the slough. He testified:

"I told him of the low place in the slough, and told him that the slough could be drained, and that there was a good out-

let below. I told him that the soil was sandy loam, and that there was some sand on the ridges and about the buildings.''

The principal witness for the plaintiff on the question of actual value of the land in its soil condition was Hart. He had known the farm for more than 40 years. It had been a part of his father's estate, and had been occupied and farmed by his brother for years. He fixed the lowest valuation thereon, of $110. Being later recalled, he testified to the valuation of the farm as it would be if the farm had been as represented, and fixed such valuation at $200. He had previously testified to the sandy character of the soil and the presence of the slough. In cross-examination, upon his recall, he testified as follows:

"By productive soil, I mean 'ready for business all of the time.' By productive, I mean good, strengthy soil, that will raise a good crop each year. I have known that farm for a good many years, and know it has raised grain each year I knew it. It has raised better crops some years than others. There are degrees of fertility. Some soils produce a great deal more than others. That farm has produced more in some years than in others.

"Q. When your brother was on there, good crops were raised? A. Well, not really good,—*not the best.* Q. And still you would call it fertile soil, under his management, would you not? A. *Well, fairly. Not the best.*"

The foregoing is illustrative of how hazy is the distinction between a ''sandy loam'' and a ''sandy soil;'' between land ''productive'' and land *''less productive.''*

It is undisputed that the defendant himself had never seen this farm prior to June, 1919, when he bought the same. He had never occupied it or farmed it himself. It appears without dispute, also, that a good crop was raised thereon in 1919. The defendant had no acquaintance with the land prior thereto. When the defendant described the land to plaintiff, he had no apparent reason to believe that the plaintiff would not investigate for himself. He interposed no obstacle in the way of such investigation. The plaintiff did send his wife and Quaas, an experienced and competent man, and the agent Fleming, to examine the farm. They spent an hour and a half upon the farm in such examination, though they claim that the farm was

then covered with snow and ice. It is, nevertheless, undisputed that the sandy condition of the knolls and ridges was observable to them, and observed by them, and that the spade was used in such places. Quaas testified for the plaintiff that the day was pleasant; that it "was only in places, where the ridges were, where the ice and snow was off." On cross-examination, he testified:

"We found a kind of boggy slough there, but it was frozen up hard. We looked over the buildings, and found a spring and a cedar grove near the buildings. When I got home, I reported to Mr. Eckstein what I saw, and the matter was talked over between us some, but not much. I think it was the next morning that I reported to Mr. Eckstein. I don't know whether I told Mr. Eckstein that the place looked like it might be sandy or not. I did discover some sand by the house. I did not pay much attention to the sand in the field. I was looking for the lay of the land. I saw some pretty good cornstalks growing on there. These attracted my attention, and was a sign that there might be pretty good land there. I saw plenty of such cornstalks; and when I reported to Mr. Eckstein, I told him about that, and told him about the boggy slough, and about the general lay of the land. I told him it looked like a pretty good farm, the way the corn crop looked, and the cornfield, and the corn they had in the crib. They had a pretty good corncrib full there. I don't think I told him anything about the value of the farm."

The following testimony of the defendant was undisputed:

"Mr. Quaas said that the hogbacks, as he called the ridges, afforded ample drainage for the farm without washing, and that he thought it was an ideal farm with respect to drainage, and spoke that he thought the main slough, if tiled out, would be the best land on the farm. He said he thought it was not sandy enough to hurt the soil much, because the cornstalks that were there showed that there were good crops produced the preceding season; and he said he didn't think the sand was bad enough to interfere greatly with the raising of crops. There was corn on the east 40, and shock fodder on the south end of the farm. There was some frost in the ground, but the spade was struck down occasionally until we got to the frost.

Then we went and looked around the buildings. Mr. Fleming was along with Mr. Quaas all of the time. The three of us went over the farm together.''

No contradiction to the foregoing was offered on the trial.

Up to this point, we find nothing in the evidence that would justify the jury in giving to the representations made by the defendant any other character than that of legitimate puffing and praise of his property. One other feature of the case, however, is to be taken into account, and we give it consideration in the next division hereof.

V. In awarding plaintiff a verdict of $12,000, the jury necessarily found that the contract entered into between the parties was unconscionable. If unconscionable, that fact itself became a circumstance to be considered on the question of fraud. Does the evidence warrant a finding that the contract was unconscionable? The price named was concededly a trading price. The stock of goods to be traded for was put into the trade also at a valuation largely in excess of its real value. Alburnett is a village of 300 or 400 people. The stock was made up largely of old and shelf-worn goods. A description of it appears in the testimony of defendant, Storck, which is in no wise contradicted. It is too lengthy to be incorporated herein. It was a heterogeneous stock, and contained a little of everything except staple articles, from ''lice killer'' and ''fly chaser'' to ''transmission grease,'' ''automobile accessories,'' and an ''attachment for converting a Ford automobile into a tractor.'' Betwixt these extremes were dry goods and men's clothing, from both of which colors had faded; shoes and men's furnishing goods in styles forgotten, including dress shirts with ''colored bosoms.'' This stock was invoiced to the defendant at wholesale prices. The invoice amounted to $15,900. It appears from the defendant's testimony, without contradiction, that its actual value was less than 40 per cent of such prices.

5. FRAUD: unconscionable contract: evidence.

Defendant testified to the following conversation with the plaintiff:

''* * * he said the price of the farm was too high. I told him it might be high, but I didn't consider it high in this case, in connection with the trade, because farm values were holding

up, and merchandise values looked like they were breaking and going down, and I would probably be the loser in the end. He told me that he had dealt for a farm traded at Mt. Vernon for $250 an acre, and that that was enough. Finally I told him I would reduce the price to $260 an acre, if he wanted to trade at that price. We finally agreed to trade on that basis.''

No contradiction was offered to the foregoing. It is undisputed, therefore, that the plaintiff put a trading price upon his property which carried abundant inflation.

It further appears that the defendant bought the farm in question in June preceding, and that he paid therefor the sum of $162.50 per acre cash. He bought it as an investment, believing that he had a bargain therein, and believing that the advancing prices of land would result in a large profit. The period of time between June, 1919, and February, 1920, has become very familiar to all the courts of Iowa, and very memorable both to sellers and purchasers of real estate during such period, as a time of frenzied advance in land values. Notwithstanding the diminutive valuation put upon the farm by plaintiff's witnesses, the actual price for which it sold in June, 1919, was the best evidence of its market value at that time. There is no pretense in the evidence that either this land or any other land in Linn County diminished in value in the intervening time between June and February. The defendant had a right to believe, at the time of his purchase, that he had obtained the land at a bargain. He had an equal right to believe that he was the beneficiary of an extraordinary rise in land values in the ensuing months. That he should advance his price accordingly had in it no necessary quality of fraud. This would be so, even if he had sold his land at such advance to a cash purchaser. By the same token, he would be justified in demanding a still larger price where the consideration was to be, in substantial part, a stock of shelf-worn goods. Inasmuch as plaintiff traded in his stock of goods at a greatly inflated valuation, the worst that can be said against the defendant is that the parties set inflation against inflation. It would be trifling with candor to say that the plaintiff did not so understand. Such understanding gives consistency to his subsequent attitude, and explains why it took him two years to discover the alleged fraud. The first demand

upon the defendant was made by service of the original notice in this action.

We hold that the evidence wholly fails to show that the contract entered into was unconscionable.

In so holding at this point, we are not setting damage against damage, nor purporting to reduce plaintiff's damages by counterclaim. We consider the question here only in our search of the record for circumstances which could be deemed indicia of fraud, and which, as such, might be effective in transforming into fraudulent representations, what otherwise must be deemed privileged expressions of puffing and praise.

One of the grounds of motion for a new trial was that the verdict was not sustained by the evidence. We think the motion should have been sustained on that ground. The case has many similarities to that of *Barr v. Butler*, 197 Iowa 575, already cited, and has even less merit.

The judgment below is, accordingly, reversed.—*Reversed and remanded.*

FAVILLE, C. J., and ARTHUR and ALBERT, JJ., concur.